PEDRO A SIMPSON
957 S NIELSON ST
GILBERT AZ 85296-3668
(602) 809-3764

FILED ____ LODGED
____ RECEIVED ____ COPY

MAR 0 9 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

PEDRO A SIMPSON,

          Plaintiff,

v.

MEGAN J. BRENNAN, POSTMASTER GENERAL,

          Defendant(s).

CASE NUMBER:  **CV20-00495-PHX-DWL**

**COMPLAINT**

## I.  Jurisdiction

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331. This employment discrimination lawsuit is based on:

  a.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et. seq., for employment discrimination on the basis of race, color, religion, gender, or national origin.

  b.  Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621, et. seq., for employment discrimination on the basis of age (age 40 or older).

2. Plaintiff is a resident of Gilbert, Maricopa County, AZ and a citizen of the United States. Defendant(s) are a United States Agency and its employees. The cause of action arose in this court's Phoenix Division.

## II.  Employment Discrimination Complaint

1.   The conduct complained of in this lawsuit involved, inter alia, the following: Constructive Termination of Plaintiff's employment; Failure to accommodate Plaintiff's disability; Retaliation; Terms and conditions of employment differ from those of similar employees; Harassment; Other; Hostile Work Environment.

2. The conduct above is referred to in the charge of discrimination. Plaintiff believes that he was discriminated against because of his, Inter Alia:  Race; National Origin; Color; Disability; Age.

3. The reasons above are referenced in the charge of discrimination. The discriminatory conduct occurred at: USPS AZ District Office, 4949 E Van Buren Rd, Phoenix, AZ 85026 on June 6, 2019.

4.   Plaintiff has been a USPS employee since November 15, 1976.  Plaintiff began his USPS career at the age of 17.  Plaintiff has been a meritoriously decorated member of the USPS Management's Executive and Administrative (EAS) staff since about 1980.  On June 6, 2019, Plaintiff was 162 days from his 43rd anniversary as a meritorious USPS employee.  Plaintiff was also 7 days from his 60th birthday. The first Arizona District Manager (DM) promoted Plaintiff, by personal invitation, into his Direct staff as Manager, Information Systems (later referred to as AZ District IT Manager) in about November 1992.  Plaintiff remained in that highly coveted position meritoriously performing until the USPS constructively discharged him with great prejudice, emotional violence, and public humiliation, on June 06, 2019.   On that date, **two female managers** who also reported to the District Manager and who were Plaintiff's **organizational peers**, forcefully and with great emotional violence permanently removed Plaintiff from his USPS office, ejected him from the District Office compound including the secured parking lot, and permanently removed Plaintiff from his position. The USPS has NEVER provided Plaintiff with Due Process regarding these actions despite the fact that Plaintiff demanded his appeal rights on the same date.  Plaintiff had intended to continue his employment as IT Manager or District Manager for at least another 12 years.  Plaintiff's explanation of the facts as he recited them to the USPS follows:

5.   On June 06, 2019 Plaintiff sent the following message via his personal email to Acting District Manager, Richard (Marty) Chavez, who was his Acting Organizational Manager:

*Dear Marty,*

*This AM at about 0545, POOM Tina Sweeney and HR Manager Lerene Wiley delivered a letter to my office, while I was already working.  Tina handed me a letter titled "EMERGENCY PLACEMENT IN AN OFF DUTY STATUS.  The cryptic allegation stated is"*

*Your [sic] sent an inappropriate message (A) District Manager Marty Chavez on June 5, 2019.*

*Tina demanded that I leave the USPS smartphone, laptop, the key to my office, and my USPS ID.  Then, she demanded that I leave the premises immediately and they escorted me to my vehicle and watched as I exited the compound.*

*The letter cites two ELM provisions, to which I do not have access.  Thus, I am deprived of my right to a clear statement and an explicit statement of my rights.  Therefore, this message will serve as my Notice of Appeal pursuant to all of my legal rights without any waiver.*

*Additionally, last week, on or about May 31, 2019 I sent an email notice to Marty Chavez, my staff, and DM Admin Dawn Simpson.  In that message, which I retained in my personal archives, I advised the recipients about the severe side-effects that I have been experiencing since recently completing Radiation and Hormone Therapy pursuant to my active cancer treatment.  I expressed that I already have an FMLA Certification, which I have not used because I prefer to work. I expressed my regret that I could not drive to the Mid-Year Meeting.*

*I am attaching my completed and signed FMLA Certification pursuant to DOL guidelines.  Thus, I demand my right to sick leave pursuant to my rights under the Family Medical Leave Act (FMLA).  I do not waive any of my FMLA rights.  Since I already worked today, I will begin FMLA Sick Leave tomorrow,*

*06/07/2019.*

*Your actions are clearly retaliatory. I have been working an office schedule from 0500-1300 since Marty retaliated against me for the fact that I am working under a Reasonable Accommodation Agreement. According to Marty, despite my FLSA EXEMPT Status, "working from home does not count." Thus, I have, in good faith, worked a restricted office schedule plus any other work that my position requires from home, including weekends and holidays. Marty began his retaliatory campaign to eliminate me immediately after Gail Hendrix left from her detail and Marty began his detail as DM.*

*I intend to exercise all of my available rights. Therefore, please provide me with information about how to contact an EEO Specialist.*

*You may reply to or contact me at this email address. (pasimpson_esq@hotmail.com)*

*Pedro*

*Attachment: FMLA Certification*

6.  The letter that Plaintiff references placed him in an off-duty status **without pay and without Due Process**. Thus, Plaintiff immediately sought to protect his financial status.

7.  Plaintiff's Hostile Work Environment began in the Summer of 2018. Plaintiff had been through some 6-7 surgeries due to his first cancer surgery in March 2016. DM John DiPeri (JD) had worked with Plaintiff and they ensured that the IT team was fully engaged in competently supporting every aspect of the business. **In fact, JD awarded Plaintiff an EOFY Performance Award in the Fall of 2017.** When JD went on Detail to the Western Area in 2018, the Saint Louis Missouri (Mid-America) DM, Gail Hendrix was detailed into JD's job. She very quickly began a campaign to eliminate Plaintiff from his job. She tasked Plaintiff with meaningless assignments, e.g., providing a report on each Telecommunications Outage in the District. In other words, every day Plaintiff had to perform a root cause and remediation evaluation every time one of the

approximately 700+ District Postal Facilities lost telephone or Network service. These outages happen on a regular basis and are usually caused by a failure in the Telecom Providers' Infrastructure. These failures include old wiring in the streets and technology failures anywhere in the providers' infrastructure. Gail claimed that there were never any outages in her District. The IT manager in that District laughed at that statement. That statement is patently false. HQ USPS Telecom Services has an entire team of Managers, Engineers, and technicians who monitor and push the Contract Providers to remediate outages. The District is not even copied when an outage occurs because the process is intended to be automatically supported by HQ IT Telecom Services. District IT gets involved when the local or National Contract Providers fail to act timely. Gail was clearly attempting to show that Plaintiff was not satisfactorily performing his function. Plaintiff has copies of the reports that he provided to Gail in his Postal Outlook folders, which Plaintiff cannot access.

8.   Next, Gail forced Plaintiff into a Reasonable Accommodation Process intended to return him to his office. Plaintiff met with the District Reasonable Accommodation Committee (DRAC), Lerene Wiley and two employees from her team. Plaintiff provided detailed information about his, ostensibly temporary, disability. Plaintiff reached an Agreement with the DRAC and on June 27, Lerene Wiley sent him a letter articulating Plaintiff and Lerene Wiley's agreement but granting authority over the "specific details" to Plaintiff's District Manager. Plaintiff returned to his office on July 9, 2018 and worked an office schedule based on the spirit of his agreement with the DRAC. By that time, Richard (Marty) Chavez was detailed to DM. Soon thereafter, Chavez summoned Plaintiff to Chavez' office. Chavez admitted that he did not even know what Plaintiff's duties required. Plaintiff candidly asked Chavez whether Chavez had received ANY COMPLAINTS about Plaintiff's performance. Chavez replied that he had not received any complaints. Chavez noted that he was monitoring Plaintiff's office time by Plaintiff's badge entry and exit records. Chavez stated that, "working from home does not count." Chavez suggested

that Plaintiff begin an early schedule.  So Plaintiff began very diligently coming into his office at 0500 and leaving at 1300.  Additionally, Plaintiff continued to work from home, including afternoons, evenings, and weekends.  Plaintiff's duty to the USPS has always driven his performance.  So Plaintiff continued to work from home in addition to his 8-hour office schedule.  Chavez stated that if Plaintiff did not like the requirement, Plaintiff should appeal it to the Western Area.  Plaintiff appealed it to the Western Area.  Of course, more than 10 days had elapsed since the DRAC agreement.  Thus, the Western Area HR Manager denied Plaintiff's appeal.

9.  Thereafter, the work environment became extremely and increasingly hostile toward Plaintiff.  As an example, Plaintiff's duties to the USPS included ensuring that District employees did not violate the Fair Labor Standards Act using USPS IT assets (FLSA; See ELM §440+).  That was a part of Plaintiff's function since about 1993.  Plaintiff did not change his diligent routine.  But Plaintiff's decisions began to be escalated to the DM.  Obviously, none of Plaintiff's District Executive Staff (organizational) peers had an answer to protecting the USPS from FLSA violations.  So that became a trigger point.  Executive Staff members normally did not even challenge Plaintiff's decisions directly.  They simply allowed employees to blatantly violate the FLSA.  Plaintiff can and will provide examples of the hostility toward his duty to protect the USPS from FLSA violations.

10.  Ultimately, Plaintiff's hostile manager, his organizational peers, and other subordinates found their opportunity during the week of June 6, 2019.  First, Plaintiff was unable to attend the Mid-Year Meeting, which was held in Avondale AZ – too far for Plaintiff to drive given one of his disabilities.  At the same time, the District was preparing for a promotional upward mobility event in Albuquerque NM.  The District promoters selected a non-postal site for the event.  The District's promoters, including Tucson Plant Manager, Renee Jones-Chaney demanded support from District IT, which District IT has never provided nor are capable of providing.  Two days before the event, Renee, by email, provided a list of demands, which she stated were the **minimum**

**requirements from District IT**.  Plaintiff now knows that Chaney was directly relying on advice from Ramone Williams.  Ramone was one of three detailees, whose details Plaintiff had terminated in August 2018.  Ramone Williams, Fredrick Hutchison, and Nicolaas Staalberg all filed EEOs.  Ramone and Fredrick filed against Plaintiff and Perry Dotson.  Nick Staalberg only filed against Plaintiff.  Plaintiff reached agreements with Fredrick and Nick.  Plaintiff does not have a status on Ramone's EEO complaint.

11.  Plaintiff's reply to Renee Jones-Chaney articulated his position about why District IT could not deliver her demands.  District IT has never purchased or used a tractor-trailer of presentation hardware.  For off-site events, District IT support is limited to access to the USPS network and interfacing with the contracted site's IT group to coordinate what they must deliver.  Upon information and belief, Ramone misled Renee about what she could expect from District IT.  So she complained to Marty Chavez.  In turn, Marty instructed Plaintiff to provide everything on the list.

12.  In the alleged "inappropriate" email message, Plaintiff advised Chavez that the District would be required to spend funds, Chavez would have to approve the funds, and neither Plaintiff nor District IT would violate Federal purchasing laws (and Western Area Purchasing Guidelines).  That message is consistent with Plaintiff's duty to the USPS regarding the federal purchasing guidelines and procuring hardware and services generally.  Plaintiff has provided USPS EEO a copy of the "inappropriate" message.  The message is unequivocally NOT inappropriate.  Rather, it is a recitation of Plaintiff's duty to the USPS and it is no different from what Plaintiff has provided as advisory information to the District Manager and his peers routinely throughout Plaintiff's USPS career and especially as IT Manager.

13.  The first District Manager, by invitation, promoted Plaintiff into the District IT Manager position on or about November, 1992.  A critical duty of the position, which Plaintiff accepted, is to diligently manage the purchase of Information Technology (IT) to protect the USPS from violations of federal purchasing laws.  Another critical duty of the position is to diligently manage how employees and managers use USPS IT assets to

1  avoid waste or abuse of USPS assets and to protect the USPS from violations of the

2  Fair Labor Standards Act (FLSA).

3      14.  The letter placing Plaintiff off duty on an emergency basis specifically states

4  that Plaintiff would be Off Duty WITHOUT PAY.   Thus, the letter forced Plaintiff

5  immediately to demand a pay status, which Plaintiff knew that his hostile oppressors

6  could not deny – FMLA Sick Leave.  Plaintiff was forced to demand that status to

7  protect his financial status.  In fact, Plaintiff's action only mitigated his loss from the

8  illegal actions of USPS management.

9      15.  Richard (Marty) Chavez and the entire team of managers whom Plaintiff

10  copied, ignored Plaintiff's request demanding his appeal rights and his request for

11  information about how to file his Equal Employment Opportunity (EEO) Complaint.

12  Consequently, on June 13 (on Plaintiff's 60th birthday), Plaintiff filed the following EEO

13  Complaint via the USPS online EEO system:

14  *USPS' managerial malfeasance, without Due Process, constructively removed or suspended me from my very prominent and meritoriously earned position in the USPS. I have meritoriously spent the last 27 years as Manager Information Systems in the AZ District.*

15

16

17  *On 06/06/2019 AM at about 0545, POOM Tina Sweeney and HR Manager Lerene Wiley delivered a letter to my office, while I was already working. Tina handed me a letter, which she signed, titled "EMERGENCY PLACEMENT IN AN OFF DUTY STATUS. The cryptic allegation stated is"*

18

19

20  *Your [sic] sent an inappropriate message (A) District Manager Marty Chavez, on June 5, 2019.*

21

22  *Tina demanded that I leave the USPS smartphone, laptop, the key to my office, and my USPS ID.  Then, she demanded that I leave the premises immediately and they escorted me to my vehicle and watched as I exited the compound.*

23

24  *By Lerene and Tina's actions, I have been constructively suspended without pay and without Due Process.*

25

26  *Tina and Lerene are my peers who report to the same District Manager. Through their actions, the USPS publicly humiliated me, removed me from my office by their physically coercive actions, constructively assaulted and battered me by forcing me to leave my official office.  Collaborators created a*

27

28

*Hostile Work Environment. They intentionally inflicted Emotional Distress upon me. They have irreparably harmed me by their and their collaborator's actions including:*

*\*Falsely accusing me, and removing me from my very prominent position for allegedly sending an "inappropriate message." (Without Due Process)\*Defaming and Slandered me throughout the USPS. I am irreparably damaged by their actions both in my USPS position and my private life.*

*I support an extended family, including my son, (4-year-old) grandson, and his mother and two older sibling sisters. Based on my mentors, I fully have expected to serve at least another 12 years to support them.*

*I am irreparably harmed.*

16.  After the June 06, 2019 event that Plaintiff describes above, someone within the USPS SUSPENDED all of Plaintiff's USPS IT Infrastructure rights.   No one from Plaintiff's group of hostile oppressors invited him to a Fact Finding, which would have established whether or not the USPS had a legitimate reason for placing Plaintiff on an off duty status without pay or suspending Plaintiff.   No one from Plaintiff's group of hostile oppressors advised him about how to file an Agency EEO Complaint.   Ultimately, **without due process**, the actions of Plaintiff's oppressors required him to submit a petition for retirement on July 1st, 2019.

17.   Via the actions of Plaintiff's oppressors, the USPS has constructively TERMINATED Plaintiff's nearly 43-year meritorious career.    Plaintiff's hire date is 11/15/1976. And Plaintiff intended to work for at least another 12 years.

### III.    Demand

1. Initially, Plaintiff requested that the USPS fully restore Plaintiff to his coveted position and include full restoration of Plaintiff's financial position and assets including, among other things:

   a. The USPS must fully restore the income that Plaintiff has lost because the USPS constructively terminated Plaintiff via the illegally discriminate actions of its management officials.
   b. The USPS must fully restore the life insurance (or its equivalent monetary value) that Plaintiff was diligently paying to provide for Plaintiff's family in case of Plaintiff's death.  This is an especially egregious loss given that Plaintiff has been

battling cancer since 2016.  Due to Defendant(s) illegal actions, if Plaintiff loses his battle with cancer the coverage that he worked to protect his family for almost 43 years will not exist.

c. The USPS must restore Plaintiff's service time and the amounts that Plaintiff has lost by mitigating his losses by applying for retirement.  These damages include the amount of over-payment into the Civil Service Retirement System that Plaintiff was making regularly, annual leave balance, and sick leave balance.

d. The USPS must compensate Plaintiff for the emotionally violent and intentionally inflicted emotional distress which Plaintiff suffered and continues to suffer because the USPS constructively terminated him via the illegally discriminate actions of its management officials who also violated Plaintiff's Due Process rights.

e. The USPS must apologize to Plaintiff because the USPS constructively terminated Plaintiff via the illegally discriminate actions of its management officials.  The apology must be written and admit that the USPS constructively and wrongfully terminated Plaintiff via the illegally discriminate actions of its management officials.  The USPS must place that apology in Plaintiff's Official Personnel Folder.

f. Except for the apology herein, the USPS must remove, from any of Plaintiff's records, any document that references a claim that Plaintiff performed any inappropriate action to deserve the fact that the USPS constructively terminated Plaintiff via the illegally discriminate actions of its management officials.

g. The USPS must provide remedial training to the management officials who constructively terminated Plaintiff via the illegally discriminate actions of its management officials.  Remedial training must include Plaintiff's right to Due Process, which the USPS failed to provide when the USPS constructively terminated Plaintiff via the illegally discriminate actions of its management officials.  The USPS must place a Letter of Warning (LOW) in the Official Personnel Folders of the management officials involved.  The LOW must state that future acts of similar illegal discrimination will result in termination of their employment, subject to their Due Process rights.

2. USPS Management has with full knowledge of Plaintiff's complaint and in bad faith, posted and permanently awarded Plaintiff's coveted USPS position.  Therefore, the USPS and its management staff have irreparably harmed Plaintiff and it is not plausible to restore him to his coveted position.  Since Plaintiff's goal was to work in his position or as Arizona District Manager until at least the age of 72, Plaintiff demands a monetary settlement of $2,500,000.00.  If Plaintiff had not received any SALARY increases, the USPS would have paid him at least $1,369,000.00 for his work.  Additionally, Plaintiff demands the applicable demands from (1) above.

3. Based upon Federal Law, Plaintiff demands all equitable and compensatory damages as the court may find just under the circumstances.  After all evidence is presented, the amount may well exceed my original demand against the agency.

**4. Plaintiff also seeks the following amount in monetary compensation:**

**$2,500,000.00.**

5.  Plaintiff additionally requests an award of his (applicable) reasonable Attorney Fees and Costs.

### IV.    Trial

Plaintiff respectfully requests a trial by jury.

### V.    Administrative Procedure

Plaintiff has filed a charge of discrimination against the defendant(s) with the USPS EEO Counselor/Officer.  Plaintiff has received a Notice of Right to Sue Letter.

Date:03/06/2020_____

PEDRO A SIMPSON
957 S NIELSON ST
GILBERT, AZ 85296-3668
(602) 809-3764

# UNITED STATES POSTAL SERVICE
# EQUAL EMPLOYMENT OPPORTUNITY CASE
# IN THE MATTER OF:

Pedro Simpson,
Complainant

v.

Megan J. Brennan,
Postmaster General,
c/o Western Area
Respondent.

Agency Case No.      4E-852-0133-19

Formal Filed:    September 25, 2019

## FINAL AGENCY DECISION - MIXED CASE

### Introduction

Pursuant to Equal Employment Opportunity Commission (EEOC) regulations at 29 C.F.R. §1614.302(d), this is the final agency decision of the U.S. Postal Service regarding the complaint of discrimination identified above.

### Statement of Claim

Complainant alleged a hostile work environment in June 2018 resulting in his premature retirement (constructive discharge) on June 30, 2019, based on Race (Native Mexican American), Color (Brown/Black), National Origin (Mexico), Age (DOB: 06/13/1959), Retaliation (Reasonable Accommodation), Physical Disability (Cancer), Mental Disability (Cancer), and Genetic Information (Indigenous Ancestry) in that:

1. On or about June 2018, Complainant was tasked with meaningless assignments and attempts were made to show that he was not performing his functions;

2. On or about June 2018, Complainant was forced into a Reasonable Accommodation Process;

3. On or about July 9, 2018, Complainant became aware his office hours were being monitored by the District Manager when he suggested Complainant begin an early schedule;

4. On or about June 5, 2019, Complainant was directed to provide last minute IT assistance for an off-site event that would require funds to purchase the equipment needed for the event; and

5. On June 6, 2019, Complainant was placed on Emergency Placement in an Off-Duty Status without pay and escorted out of the building.

## Chronology

The complaint was processed in accordance with applicable Equal Employment Opportunity Commission (EEOC) regulations, 29 C.F.R. §1614.103 *et. seq.* Following a Postal Service investigation, Complainant was provided a copy of the investigative file and notified of the forthcoming final agency decision on the merits. Thus, this decision is being issued on the merits of the complaint accordance with EEOC Regulation 29 C.F.R. §1614.302(d)(2) and (3).

## Applicable Law

### Disparate Treatment

The United States Supreme Court established a burden-shifting framework for analyzing claims of discrimination in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), and subsequently refined that analysis in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).  The McDonnell Douglas and Burdine approach involves a three-step process when a complainant alleges intentional discrimination based on a disparate treatment theory.  The Equal Employment Opportunity Commission has adopted this approach in its decision making.  Downing v. U.S. Postal Service, EEOC Appeal No. 01822326 (September 19, 1983); Jennings v. U.S. Postal Service, EEOC Appeal No. 01932793 (April 13, 1994); and Saenz v. Department of the Navy, EEOC Request No. 05950927 (January 9, 1998).  A complainant alleging discrimination must first demonstrate that there is some substance to his or her claim.  To satisfy this burden, Complainant must establish a *prima facie* case of discrimination for each of the bases of discrimination alleged by a preponderance of the evidence.   Furnco Construction Company v. Waters, 438 U.S. 576 (1978).

Although a complainant may establish a *prima facie* case by presenting direct evidence of discrimination, the more frequent method of establishing a *prima facie* case is through circumstantial evidence by showing that he or she: (1) belongs to a protected group; (2) was subjected to an adverse employment action; and (3) was treated differently in this regard than similarly situated individuals who were not members of the protected group. Hill v. Department of Veterans Affairs, EEOC Appeal No. 0120063979 (November 28, 2007); Mayberry v. Vought Aircraft Company, 55 F.3d 1086, 1090 (5th Cir. 1995); Mitchell v. Toledo Hospital, 964 F.2d 577, 582-83 (6th Cir. 1992). The failure to establish a specific element of a *prima facie* case may be overcome by presenting evidence of agency actions from which an inference of discrimination could be drawn if they remained unexplained. Day v. U.S. Postal Service, EEOC Appeal No. 01996097 (September 18, 2000).

Once a *prima facie* case has been established, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. Furnco, 438 U.S. at 578.  *See also* St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). The employer need not persuade the trier of fact that the proffered reason was its actual motivation but merely needs to raise a genuine issue of fact as to whether it discriminated

against Complainant.  <u>Burdine</u>, 450 U.S. at 254; <u>Keval v. Commodity Futures Trading Commission</u>, EEOC Appeal No. 01832127 (November 2, 1984); <u>Hollis v. Department of Veterans' Affairs</u>, EEOC Appeal No. 01934600 (May 3, 1994).  If the agency offers no adequate explanation for the discrepancy in treatment between Complainant and similarly situated employees, the agency does not carry its burden of production and Complainant prevails on the basis of the inference of discrimination created by the *prima facie* case. <u>Frady v. U.S. Postal Service</u>, EEOC Appeal No. 01A05317 (January 10, 2003); <u>Houston v. Department of Veterans' Affairs</u>, EEOC Appeal No. 01976054 (August 27, 1999); and <u>Parker v. U.S. Postal Service</u>, EEOC Request No. 05900110 (April 30, 1990).

If the employer meets this burden, any presumption of discrimination created by the *prima facie* case disappears; it simply "drops from the case." <u>Hicks</u>, 509 U.S. at 507; <u>U.S. Postal Service Board of Governors v. Aikens</u>, 460 U.S. 711, 715 (1983).  *See also* <u>Hernandez v. Department of Transportation</u>, EEOC Request No. 05900159 (June 28, 1990) and <u>Peterson v. Department of Health and Human Services</u>, EEOC Request No. 05900467 (June 8, 1990).  Complainant can then prevail only if he or she proves that the employer's reasons are not only pretext but are pretext for discrimination. <u>Hicks</u>, 509 U.S. at 507 and 516; <u>Nichols v. Grocer</u>, 138 F.3d 563, 566 (5th Cir. 1998); <u>Swanson v. General Services Administration</u>, 110 F.3d 1180, 1185 (5th Cir. 1997).  *See also* <u>Papas v. U.S. Postal Service</u>, EEOC Appeal No. 01923753 (March 17, 1994) and <u>Bradford v. Department of Defense</u>, EEOC Appeal No. 01940712 (September 20, 1994).  Thus, Complainant cannot create a factual issue of pretext based merely on personal speculation that there was discriminatory intent.  <u>Southard v. Texas Board of Criminal Justice</u>, 114 F.3d 539, 555 (5th Cir. 1997); <u>Lyles v. U.S. Postal Service</u>, EEOC Appeal No. 01A11110 (May 22, 2002); and <u>Nathan v. U.S. Postal Service</u>, EEOC Appeal No. 01995788 (August 29, 2001).

Pretext involves more than a mistake.  It means that the reason offered by management is factually baseless, is not the actual motivation for the action, or is insufficient to motivate the action.  <u>Tincher v. Wal-Mart Stores, Inc.</u>, 118 F.3d 1125, 1130 (7th Cir. 1997) and <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997).  Complainant always carries the "ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination." <u>Burdine</u>, 450 U.S. at 254 and <u>Hicks</u>, 509 U.S. at 511.

The ultimate burden of persuasion remains with Complainant.  <u>Board of Trustees of Keene College v. Sweeney</u>, 439 U.S. 24, 25 N.2 (1978).  This burden was reaffirmed and clarified in <u>St. Mary's Honor Center v. Hicks</u>, *supra.*, where the Court held that in order to impose liability upon an employer for discriminatory employment practices, an ultimate finding of unlawful discrimination is required whether or not the employer's explanation for its action was believable. *See also* <u>Brewer v. U.S. Postal Service</u>, EEOC Appeal No. 01941786 (June 21, 1994) and <u>Montoya v. Department of Housing and Urban Development</u>, EEOC Appeal No. 01940999 (August 4, 1994).

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 4

## Age Discrimination

In order to establish a *prima facie* case of age discrimination, a complainant must show proof of the Title VII criteria set forth by the Supreme Court in McDonnell Douglas; *Id.* O'Connor v. Consolidated Coin Caterers Corporation, 517 U.S. 308 (1996); Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1979); and Mitchell v. Department of the Interior, EEOC Appeal No. 01990787 (January 10, 2002). The agency's burden to articulate a legitimate, nondiscriminatory reason for its action and Complainant's burden to prove pretext remain the same as in a Title VII disparate treatment case. The Court in O'Connor also held that it is not just a question of whether a comparison employee is outside the protected age category but also whether the comparator is substantially younger than Complainant. *See also* Pullman v. U.S. Postal Service, EEOC Appeal No. 01A31036 (March 18, 2004); Hammersmith v. Social Security Administration, EEOC Appeal No. 01A05922 (March 6, 2002) (more than five-year difference sufficient); and Hickman v. Department of Justice, EEOC Appeal No. 01A11797 (December 20, 2001) (four-year difference not sufficient). Conversely, the ADEA does not protect an individual in the protected age category from the treatment afforded to an older individual. *See* General Dynamics Land Systems, Inc. v. Cline *et al.*, 540 U.S. 581(2004). A complainant alleging age discrimination must prove not only that age was considered, but also that age made a difference in the outcome of the employer's decision-making process; *i.e.* was the determining factor. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000) and Hazen Paper Company v. Biggins, 507 U.S. 604, 610 (1993). If Complainant's burden fails on either point, no relief is provided. Cleverly v. Western Electric Company, 594 F.2d 638, 641 (5th Cir. 1979); Kentroti v. Frontier Airlines, 585 F.2d 967, 974 (10th Cir. 1978); Laugeson v. Anaconda Company, 520 F.2d 307, 317 (6th Cir. 1976). *See also* Sullivan v. Tennessee Valley Authority, EEOC Appeal No. 01940217 (November 9, 1994) and Lasley v. Department of Veterans' Affairs, EEOC Appeal No. 01870615 (October 8, 1987).

While private sector litigants must establish "but for" causation in connection with an age discrimination claim, that is not the case in the federal sector where a mixed motive analysis can be applied in an age case. *Compare* Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343 (2009) with Fuller v. Gates, 2010 U.S. Dist. LEXIS 17987 (E.D. TX 2010) and Alotta v. Department of Transportation (Federal Aviation Administration), EEOC Appeal No. 0120093865 (June 17, 2011).

## Person with a Disability

Discrimination based on disability and the failure to accommodate a qualified individual with a disability in connection with federal employment are prohibited by the Rehabilitation Act of 1973 (29 U.S.C. §791). The Rehabilitation Act Amendments of 1992 (P.L. 102-569, October 29, 1992) added a new Subsection (g) to 29 U.S.C. §791 making it clear that the same standards which apply to claims under the Americans With Disabilities Act are to be applied to Rehabilitation Act claims. On January 1, 2009, the ADA Amendments Act of 2008 (P.L. 110-325, September 25, 2008) became law, addressing what Congress

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 5

viewed as unduly restrictive interpretations of the ADA by the courts and administrative bodies. Following its passage, courts have consistently held that the ADA Amendments Act should not be applied retroactively. *See* EEOC v. Agro Distribution, LLC, 555 F. 3d 462 (5th Cir. 2009) and Lytes v. D.C. Water and Sewer Authority, 572 F. 3d 936 (D.C. Cir. 2009). The EEOC promulgated regulations implementing the ADA Amendments Act on March 25, 2011.

In order to assert a claim of disability discrimination, a complainant must satisfy the threshold requirement that he or she is a "person with a disability" as that term is defined in the applicable statutes and Equal Employment Opportunity Commission regulations. Title 42, United States Code, Section 12102(1) and 29 C.F.R. §1630.2(g)(1) define a person with a disability as an individual who: (i) has a physical or mental impairment which substantially limits one or more of that person's major life activities (referred to elsewhere in the regulations as "actual disability"); (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment. *See also* Melahn v. Department of the Navy, EEOC Appeal No. 01832380 (October 21, 1985). Whether an individual has a disability is not based on the name or diagnosis of the impairment involved but rather the effect which that impairment has on the individual.

## Person with a Disability – Actual Disability

The definition of what constitutes a "physical or mental impairment" remains very broad. See 29 C.F.R. §1630(h)(1) and (2). According to the Americans With Disabilities Act (ADA), the Americans With Disabilities Act Amendments Act (ADAAA), and EEOC regulations, major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *See* 42 U.S.C. §12102(2)(A) and 29 C.F.R. §1630.2(h)(2)(i)(1)(i). They also include standing, lifting, bending, reading, concentrating, thinking, communicating, and eating. The ADAAA also included within the definition of major life activity a category of major bodily functions which include functions of the immune system and normal cell growth, and respiratory, circulatory, endocrine, reproductive, digestive, neurological, brain, bowel, and bladder functions. 42 U.S.C. §12102(2)(B) and 29 C.F.R. §1630.2(h)(2)(i)(1)(ii).

The ADAAA made it clear that Congress believed that the courts and the Equal Employment Opportunity Commission had been too narrow in their interpretations of the term "substantially limits" and instructed them to apply that term "…consistently with the findings and purposes of the ADA Amendments Act of 2008" and to construe the Act in favor of "broad coverage." *See* 42 U.S.C. §12101(a)(1) and (b)(1). The Act and its implementing regulations create nine "Rules of Construction" to be applied to determine whether or not an impairment is substantially limiting. 42 U.S.C. §12102(4) and 29 C.F.R. §1630.2(j)(1). Besides calling for broad and consistent coverage and an "individualized assessment", the rules provide that an impairment is disabling if it substantially limits an individual's ability to perform a major life activity in comparison to "most people in the general population." In making this comparison, the regulations call for consideration of

Final Agency Decision
Pedro Simpson
Agency Case Number  4E-852-0133-19
Page 6

the difficulty, effort, or time required by the individual to perform the major life activity; the length of time the activity can be performed; the way in which the major life activity is affected by the impairment involved; and the non-ameliorative effects of mitigating measures such as the side effects of medication.  *See* 29 C.F.R. §1630.2(j)(4).  This regulation also makes clear that the focus should be on the effort required not the outcome that can be achieved by the individual with the impairment.

In addition, an impairment need only affect one major life activity to be substantially limiting; an impairment need not "significantly restrict" in order to be substantially limiting; and a determination concerning the application of the term should not require "extensive analysis" and not usually require scientific, medical, or statistical analysis.  The rules also state that episodic impairments or those in remission can be substantially limiting if they would be so when they are active and that even conditions which have less than a six-month duration could be substantially limiting.  Significantly, the Commission states in its regulations that the application of these rules of construction to certain medical conditions will "… in virtually all cases, result in a determination of coverage…" when assessing a possible "actual disability" (as distinguished from a "regarded as" disabled) situation.  *See* 29 C.F.R. §1630.2(j)(3), Predictable Assessments.

The ADAAA eliminated consideration of the ameliorative effects of mitigating measures when determining whether or not an impairment is substantially limiting except for consideration of ordinary eyeglasses or contact lenses intended to correct visual acuity or eliminate refractive error.  Mitigating measures include medication; medical supplies, equipment, or appliances; assistive technologies; low vision devices; hearing aids and implants; mobility devices; oxygen therapy equipment and supplies; prosthetics; and "reasonable accommodations or auxiliary aids or services", *e.g.* interpreters or readers or the modification of equipment.  *See* 42 U.S.C. §12102(4)(E) and §12103 and 29 C.F.R. §1630.2(j)(5) and (6).

A generalized assertion, without specific evidence to support it, that an individual is substantially limited is not sufficient to satisfy a complainant's burden of proof.  Lohr v. U.S. Postal Service, EEOC Request No. 05930799 (May 19, 1994); Zeigler v. U.S. Postal Service, EEOC Appeal No. 01930854 (May 12, 1994) and Jenkins v. U.S. Postal Service, EEOC Appeal No. 01954572 (March 24, 1997).  It is also not enough that the agency is in possession of a diagnosis; that an individual's supervisor knows that they have a particular condition; that Complainant has an approved claim with the Office of Workers Compensation Programs; or that Complainant has a percentage disability awarded by the Department of Veterans Affairs.  Black v. U.S. Postal Service, EEOC Request No. 05930748 (May 12, 1994); Pascale v. Department of the Navy, EEOC Petition No. 03850092 (March 5, 1986); Schnabele v. U.S. Postal Service, EEOC Appeal No. 01982634 (July 13, 2001); and Bono v. U.S. Postal Service, EEOC Appeal No. 01951113 (August 11, 1997).

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 7

## Person With a Disability – Record Of

EEOC's regulations provide that an individual may establish that he or she is a "person with a disability" by showing that he or she has a history of, or has been misclassified as having, a physical or mental impairment which substantially limits one or more major life activities compared to most people in the general population.   *See* 42 U.S.C. §12102(1)(B) and 29 C.F.R. §1630.2(k).   The Commission notes that consideration of whether or not the past condition/impairment was substantially limiting is required and that reasonable accommodation may be involved in a "record of" case; *e.g.* follow up medical care for the formerly limiting condition.

## Disability – Disparate Treatment

Courts have adopted and applied the Title VII burdens of proof to disability discrimination claims.   *See*, for example, Norcross v. Sneed, 755 F.2d 113 (8th Cir. 1985) and Prewitt v. Postmaster General, 662 F.2d 292 (5th Cir. 1981).   The Commission has also analyzed cases under this theory.   Greathouse v. Department of the Army, EEOC Appeal No. 01984880 (May 2, 2001) and Oberg v. Secretary of the Navy, EEOC Request No. 05890451 (July 20, 1989).

In analyzing a disparate treatment claim under the Rehabilitation Act, the burden-shifting method of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.   See Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, 198 F.3d 68 (2nd Cir. 1999) and Swanks v. WMATA, 179 F.3d 929, 933-34 (D.C. Cir. 1999).   Under this analysis, in order to establish a *prima facie* case, a complainant must demonstrate that he or she: (1) is an "individual with a disability"; (2) is "qualified" for the position held or desired; (3) was subjected to an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination.   Lawson v. CSX Transportation, Inc., 245 F.3d 916 (7th Cir. 2001).

## Similarly Situated Employees

One of the key elements of a *prima facie* case of disparate treatment based on an adverse employment action is proof that similarly situated comparison employees not in Complainant's protected group were treated more favorably.   This is so, in part, because agencies are not monolithic entities.   Turner v. Department of the Navy, EEOC Request No. 05900445 (September 25, 1990).   In general, in the absence of direct evidence of discrimination, if Complainant cannot identify any similarly situated comparison employees who were treated more favorably, he or she will not prevail.   Aguilar v. U.S. Postal Service, EEOC Appeal No. 01944167 (August 8, 1995).

In order for two or more employees to be considered similarly situated for the purpose of creating an inference of disparate treatment, a complainant must show that all of the relevant aspects of his or her employment situation are virtually identical to those of the

other employees who he or she alleges were treated more favorably. <u>Smith v. Monsanto Chemical Company</u>, 770 F.2d 719, 723 (8th Cir. 1985); <u>Murray v. Thistledown Racing Club, Inc.</u>, 770 F.2d 63, 68 (6th Cir. 1985); <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984); <u>Mazzella v. RCA Global Communications, Inc.</u>, 642 F.Supp. 1531, 1547 (S.D. N.Y. 1986), <i>aff'd.</i> 814 F.2d 653 (2nd Cir. 1987). The Equal Employment Opportunity Commission has on numerous occasions ruled in similar fashion. See, for example, <u>Tolar v. U.S. Postal Service</u>, EEOC Appeal No. 01965083 (December 16, 1998), citing <u>O'Neal v. U.S. Postal Service</u>, EEOC Request No. 05910490 (July 23, 1991); and <u>Knapp-Huffman v. Department of Justice (Bureau of Prisons)</u>, EEOC Appeal No. 01991026 (January 16, 2002).

If employees have different supervisors, perform different job functions, were subject to different job standards, engaged in different conduct, or worked during different time periods, they are not similarly situated. <u>O'Neal</u>, <i>id</i>; <u>Allen v. Department of the Navy</u>, EEOC Request No. 05900539 (June 15, 1990); <u>Willis v. Department of the Treasury</u>, EEOC Appeal No. 01A51459 (March 16, 2003); and <u>Stewart v. Department of Defense</u>, EEOC Appeal No. 01A02890 (June 27, 2001).

For employees to be considered similarly situated, their medical and physical restrictions must be the same as Complainant's. <u>Curtin v. U.S. Postal Service</u>, EEOC Appeal No. 01891910 (March 27, 1990); <u>Briand v. U.S. Postal Service</u>, EEOC Appeal No. 01932677 (February 2, 1994); <u>Woody v. TVA</u>, EEOC Appeal No. 0120063987 (December 17, 2007).

## <u>Retaliation</u>

To establish a <i>prima facie</i> case based on reprisal, a complainant must show that: (1) he or she engaged in prior protected activity; (2) the agency official who took the adverse employment action was aware of the protected activity; (3) he or she was subsequently disadvantaged by an adverse employment action or adverse treatment; and (4) there is a causal link between the protected activity and adverse action/treatment. <u>Hochstadt v. Worcester Foundation for Experimental Biology, Inc.</u>, 425 F. Supp. 318, 324 (D. Mass 1976), <i>aff'd</i> 545 F.2d 222 (1st Cir. 1976); <u>Manoharan v. Columbia University College of Physicians and Surgeons</u>, 842 F.2d 590, 593 (2nd Cir. 1988); <u>Coffman v. Department of Veterans' Affairs</u>, EEOC Request No. 05960437 (November 20, 1997); and <u>Whitmire v. Department of the Air Force</u>, EEOC Appeal No. 01A00340 (September 25, 2000). A complainant may establish prior EEO activity by participating at any stage of the EEO process or opposing unlawful discriminatory conduct. See, generally, <u>Lewis v. Department of the Navy</u>, EEOC Appeal No. 01810158 (May 22, 1981) (counseling stage); <u>Ballard v. U.S. Postal Service</u>, EEOC Appeal No. 01923276 (August 17, 1992) (witness); and <u>Burrough v. U.S. Postal Service</u>, EEOC Appeal No. 01842417 (June 24, 1986) (representative).

A complainant may also establish a <i>prima facie</i> case by presenting evidence which, if it was not explained, would reasonably give rise to an inference of reprisal. <u>Shapiro v. Social Security Administration</u>, EEOC Request No. 05960403 (December 6, 1996).

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 9

Obviously, Complainant must offer evidence that the agency officials who took the action were aware of his or her prior participation or opposition activity (Demeier v. Department of the Air Force, EEOC Appeal No. 01A11166 (May 23, 2002)) but establishing that alone will not enable a complainant to establish the causal connection element of a *prima facie* case. Garcia-Gannon v. Department of the Air Force, EEOC Appeal No. 01821195 (June 30, 1983). Adverse actions need not be ultimate employment actions, just adverse treatment based on a retaliatory motive, which could deter a reasonable person from engaging in protected activity. Burlington Northern Santa Fe Railway Company v. White, 548 U.S. 53 (2006); Lindsey v. U.S. Postal Service, EEOC Request No. 05980410 (November 4, 1999) and *EEOC Compliance Manual*, Section 8.D.3, Notice No. 915.003 (May 20, 1998).

The causal connection may be inferred by evidence that the protected conduct was closely followed by the adverse action. Clark County School District v. Breeden, 532 U.S. 286 (2001). The Court in Breeden noted that where a complainant is relying on temporal proximity to establish a causal connection between prior protected activity and a current adverse employment action, that proximity must be "very close" and cited with approval Circuit Court of Appeals decisions holding that time gaps of three to four months between an individual's prior EEO activity and the current adverse employment action were too attenuated to suggest an inference of retaliation. The Commission has followed suit and rendered decisions establishing much shorter time frames to establish the requisite temporal proximity. See, for example, Heads v. U.S. Postal Service, EEOC Appeal No. 01A51547 (June 2, 2005); Archibald v. Department of Housing and Urban Development, EEOC Appeal No. 01A54280 (September 22, 2005); and Lynch v. U.S. Postal Service, EEOC Appeal No. 01A24705 (August 14, 2003).

## Harassment/Hostile Work Environment

Harassment of an employee that would not occur but for the employee's race, color, sex, national origin, age, disability, or religion is unlawful if it is sufficiently severe or pervasive. Wibstad v. U. S. Postal Service, EEOC Appeal No. 01972699 (August 14, 1998), citing McKinney v. Dole, 765 F.2d 1129, 1138-1139 (D.C. Cir. 1985), and Long v. Attorney General, EEOC Appeal No. 01984213 (July 10, 2001). See also Hubbert v. Department of the Army, EEOC Request No. 05910133 (March 19, 1991); Ortega v. U.S. Postal Service, EEOC Appeal No. 01995243 (May 3, 2001); Humphrey v. U.S. Postal Service, EEOC Appeal No. 01965238 (October 16, 1998). Harassment due to an individual's prior EEO activity is also actionable. Roberts v. Department of Transportation, EEOC Appeal No. 01970729 (September 15, 2000).

To establish a claim of harassment, a complainant must show that: (1) he/she belongs to a statutorily protected class; (2) he/she was subjected to unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on the statutorily protected class; (4) the harassment had the purpose or effect of unreasonably interfering with her work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 10

employer. McCleod v. Social Security Administration, EEOC Appeal No. 01963810 (August 5, 1999).

The Supreme Court has held that an employer who creates or tolerates a work environment which is permeated with "discriminatory intimidation, ridicule, and insult" that is sufficiently severe or pervasive to alter the terms and conditions of an individual's employment and which creates an abusive work environment is in violation of Title VII. Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), citing Meritor Savings Bank F.S.B. v. Vinson, 477 U.S. 57 (1986). The conduct in question is evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred, including the severity and frequency of the conduct and its effect on the employee's work performance. Harris, Id. In order to support a finding of a hostile work environment, more than a few isolated incidents of enmity based on race, gender, national origin, religion, etc. must have occurred. Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981) and Cariddi v. Kansas City Chiefs Football Club, Inc., 568 F.2d 87, 88 (8th Cir. 1977). There must have been a steady barrage of opprobrious comments and not a casual comment or accidental or sporadic conversation in order to trigger an entitlement to relief. Snell v. Suffolk County, 782 F.2d 1094 (2nd Cir. 1986).

The Equal Employment Opportunity Commission has repeatedly held that remarks unaccompanied by a concrete agency action are not a direct or personal deprivation sufficient to render an individual aggrieved. Johnson v. Department of Justice, EEOC Appeal No. 01986199 (February 18, 2000); Backo v. U. S. Postal Service, EEOC Request No. 05960227 (June 10, 1986); and Henry v. U. S. Postal Service, EEOC Request No. 05940695 (February 9, 1995). The Commission has also agreed with the courts and held that in order to establish a case of harassment that constitutes a hostile work environment, the harassment must be ongoing and continuous and that a few isolated incidents will not be sufficient to constitute discriminatory harassment. McGivern v. U. S. Postal Service, EEOC Request No. 05930481 (March 17, 1994) and Vargas v. Department of Justice, EEOC Request No. 05931047 (October 7, 1993). The conduct involved must be viewed in the context of the totality of the circumstances including, among other things, the nature and frequency of the offensive encounters and the time span over which the encounters occurred. Rabidue v. Osceola Refining Company, 805 F.2d 611, 620 (6th Cir. 1988) and Gilbert v. City of Little Rock, 722 F.2d 1390, 1394 (8th Cir. 1993).

There are two rules for employer liability in hostile environment cases: 1) If the hostile environment is created by a supervisor or manager the employer is liable unless, as an affirmative defense, the employer can show: a) The employer exercised reasonable care to prevent and promptly correct any harassing behavior; and b) The employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. 2) If the hostile environment is created by a coworker, the employer is liable if: a) the employer knew or should have known of the harassment; and b) failed to take prompt and effective corrective action.

Final Agency Decision
Pedro Simpson
Agency Case Number  4E-852-0133-19
Page 11

An agency may generally avoid liability by showing that the acts complained of did not occur, that the conduct complained of was not unwelcome, that the alleged harassment was not "sufficiently severe or pervasive" to alter the terms or conditions of Complainant's employment or to create a hostile work environment, that immediate and appropriate corrective action was taken as soon as the employer was put on notice, or that there is no basis for imputing liability to the employer under agency principles.  Crane v. U.S. Postal Service, EEOC Appeal No. 01924585 (April 22, 1993) and Meritor Savings Bank F.S.B. v. Vinson, 477 U.S. 57 (1986).

If the alleged harasser is a supervisor and a tangible employment action is involved, the agency will be strictly liable.  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998); and Enforcement Guidance, supra, Page 7.  An acting supervisor is a supervisor for the purposes of this test.  Rhodes v. U.S. Postal Service, EEOC Appeal No. 01980284 (September 2, 1999).

When harassment does not result in a tangible employment action and a supervisor or co-worker is accused of the harassing conduct, the agency can raise an affirmative defense to liability by demonstrating that it exercised reasonable care to prevent and correct promptly any harassing behavior and that the employee unreasonably failed either to take advantage of any preventive or corrective opportunities provided by the agency or to avoid harm otherwise.  Ellerth, 524 U.S. at 765; Faragher, 524 U.S. 775, at 807 (1998); and Enforcement Guidance, supra, Page 12.  The corrective action necessary will depend upon the facts of the case and must be prompt and reasonably calculated to end the harassment.  Taylor v. Department of the Air Force, EEOC Request No. 05920194 (July 8, 1992) and Olsen v. Department of Housing and Urban Development, EEOC Request No. 05930413 (June 16, 1994).  If the actions taken by a supervisor culminate in a tangible employment action, this affirmative defense is not available.  Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 808; and Enforcement Guidance, supra, Page 7.  If a coworker of Complainant is involved, the agency will be liable if it knew or should have known about the problem and failed to take prompt and effective corrective action.  Lutticken v. Department of Health and Human Services, EEOC Request No. 05900386 (April 27, 1990) and 29 C.F.R. §1604.11(d).

The decisions make it clear that the anti-discrimination laws are not a "general civility code" and that the conduct complained of must be so objectively offensive as to alter the terms and conditions of one's employment.  Routine work assignments, instructions, and admonishments do not rise to the level of discriminatory harassment.  DiFruscio v. Social Security Administration, EEOC Appeal No. 01982006 (September 13, 2000); Wolf v. U.S. Postal Service, EEOC Appeal No. 01961559 (July 23, 1998); and Bennett v. Department of the Navy, EEOC Request No. 05980746 (September 19, 2000).

**Constructive Discharge**

In order to establish that a complainant experienced a constructive discharge, he must prove that a reasonable person in Complainant's situation would have considered the

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 12

working conditions intolerable, that the intolerable conditions were created by discriminatory conduct against Complainant, and that Complainant's retirement resulted from the intolerable working conditions. <u>Kutsky v. Department of Energy</u>, EEOC Request No. 05900036 (June 19, 1990); <u>Taylor v. AAFES</u>, EEOC Request No. 05900630 (July 20, 1990); and <u>Fritsch v. U.S. Postal Service</u>, EEOC Appeal No. 01841292 (February 12, 1985). All three elements must be present for Complainant to prevail. <u>Tipton v. Department of Veterans' Affairs</u>, EEOC Appeal No. 01841337 (July 16, 1986). The Commission applies an objective, reasonable person standard and does not consider whether an individual is unusually sensitive. <u>Horvath v. Department of Health and Human Services</u>, EEOC Appeal No. 01841498 (August 6, 1986). In sum, a complainant must establish that his working conditions were so difficult that any reasonable person in the same position would feel compelled to retire. <u>Irving v. Dubuque Packing Company</u>, 689 F. 2d 170 (10th Cir. 1982).

## Background

At all times relevant to the issue(s) in this complaint, Complainant was employed as a Full-Time Manager Information Systems at the Arizona CS District, Phoenix, AZ. (Investigative File [IF], Exhibit 1). Complainant has alleged that Director Learning and Development, Gail Hendrix; Senior Plant Manager PCES, Richard Chavez; Post Office Operations Manager, Tina Sweeney and Manager Human Resources, Lerene Wiley have intentionally subjected him to a hostile work environment beginning in June 2018 resulting in his premature retirement (constructive discharge) on June 30, 2019, based on Race (Native Mexican American), Color (Brown/Black), National Origin (Mexico), Age (DOB: 06/13/1959), Retaliation (Reasonable Accommodation), Physical Disability (Cancer), Mental Disability (Cancer), and Genetic Information (Indigenous Ancestry) in that:

1. On or about June 2018, Complainant was tasked with meaningless assignments and attempts were made to show that he was not performing his functions;

2. On or about June 2018, Complainant was forced into a Reasonable Accommodation Process;

3. On or about July 9, 2018, Complainant became aware his office hours were being monitored by the District Manager when he suggested Complainant begin an early schedule;

4. On or about June 5, 2019, Complainant was directed to provide last minute IT assistance for an off-site event that would require funds to purchase the equipment needed for the event; and

5. On June 6, 2019, Complainant was placed on Emergency Placement in an Off-Duty Status without pay and escorted out of the building.

Complainant testified that his race is "descended from historically indigenous tribes near Mexico City, ostensibly Aztec; evangelized but not catholicized." Complainant averred that his color is brown, his sex is male, and his national origin is Mexico. (IF, Affidavit A, p. 2).

Complainant further testified that his age is 60, DOB: June 13, 1959. Complainant asserted that management was aware of his age because his date of service is November 15, 1976. Complainant asserted he worked with Lerene Wiley very early in his employment as a teenager and at a District Leadership Meeting in late 2018 or early 2019, Richard Chavez awarded him a (late) 40+ year service pin. Complainant also attested that he was very vocal about the fact that he was actually approaching 43 years of service. (IF, Affidavit A, p. 31).

Complainant testified his medical condition is prostate cancer that he was first diagnosed with in January 2016. (IF, Affidavit A, p. 5).

Complainant identified his EEO activity as on or about August 2018, he terminated the details of three employees who filed EEO complaints against him.  Complainant also averred that On June 27, 2018, he met telephonically with the District Reasonable Accommodation Committee (DRAC).  (IF, Affidavit A, p. 3).

Complainant identified his genetic information as his "indigenous ancestry." Complainant asserted that the number of USPS employees who know his genetic ancestry is too large to describe and explained that he was not alleging management improperly disclosed his genetic ancestry or identity. (IF, Affidavit A, pp. 8 - 9).

### *1. On or about June 2018, Complainant was tasked with meaningless assignments and attempts were made to show that he was not performing his functions.*

Complainant attested that the hostile work environment began in the Summer of 2018 when Ms. Hendrix was acting District Manager and began a campaign to eliminate him from his job. Complainant asserted that Ms. Hendrix tasked him with meaningless assignments such as providing a daily report on telecommunications outages in the District. He noted the outages were managed by USPS Headquarters Telecom Services and the District was not involved. Complainant also testified that Ms. Hendrix instructed him to undergo the Reasonable Accommodation process and averred that the work environment became extremely hostile towards him. He explained his duties included ensuring employees did not violate the Fair Labor Standards Act (FLSA) using USPS IT assets and averred that this was part of his function since 1993, but his FLSA decisions started getting escalated to the acting District Manager. Complainant asserted that the week of June 6, 2019, he was unable to attend the Mid-Year meeting and that the same week Mr. Chavez directed him to provide support to an event in Albuquerque that resulted in his Emergency Placement. When asked why his race, color, national origin, age, EEO activity or disability and genetic information were factors, Complainant asserted, "See my allegations which I provide in this Affidavit."  (IF, Affidavit A, pp. 9 - 13).

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 14

    *2. On or about June 2018, Complainant was forced into a Reasonable Accommodation Process.*

Complainant asserted that Ms. Hendrix forced him into a Reasonable Accommodation Process that was intended to return him to his office. He explained that he met with Ms. Wiley and two other employees and reached an agreement which granted authority over the specific details to his manager. Complainant averred that he returned to his office on July 9, 2018, and worked an office schedule based on the spirit of the agreement. When asked why his race, color, national origin, age, EEO activity or disability and genetic information were factors, Complainant asserted, "See my allegations which I provide in this Affidavit." (IF, Affidavit A, pp. 14 - 15).

    *3. On or about July 9, 2018, Complainant became aware his office hours were being monitored by the District Manager when he suggested Complainant begin an early schedule.*

Complainant attested that Mr. Chavez told him he was monitoring his office time and that working from home did not count and that Mr. Chavez suggested he start early. Complainant noted that he started coming in at 5 am and leaving at 1 pm plus working from home. He asserted that Mr. Chavez told him if he did not like the requirement he could appeal it to the Western Area. Complainant explained that he appealed to the Area and his claim was denied. When asked why his race, color, national origin, age, EEO activity or disability and genetic information were factors, Complainant asserted, "See my allegations which I provide in this Affidavit." (IF, Affidavit A, pp. 14, 17).

    *4. On or about June 5, 2019, Complainant was directed to provide last minute IT assistance for an off-site event that would require funds to purchase the equipment needed for the event.*

Complainant testified that during the week of June 6, 2019, Renee Jones-Chaney "District Promoter" demanded support from District IT for an upward mobility event in Albuquerque, NM. Complainant averred that they had selected a non-postal site and were demanding support which IT had never provided before and were not capable of providing. He stated he received the request two days before the event and he replied to Ms. Jones-Chaney they could not deliver on her needs. Complainant attested that Ms. Jones-Chaney complained to Mr. Chavez who directed Complainant to provide what was asked for by Ms. Jones-Chaney. Complainant stated he sent an email to Mr. Chavez that they would need to spend funds and added that he stated in the email he needed approval for the funds as he would not violate purchasing laws. Complainant asserted that he scheduled District IT Specialist John Reese to travel to Albuquerque to provide technology support for the event. When asked why his race, color, national origin, age, EEO activity or disability and genetic information were factors, Complainant asserted, "See my allegations which I provide in this Affidavit." (IF, Affidavit A, pp. 11, 19 - 20).

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 15

### 5. On June 6, 2019, Complainant was placed on Emergency Placement in an Off-Duty Status without pay and escorted out of the building.

Complainant averred that on June 6, 2019, at 5:45 am, Ms. Wiley and Ms. Sweeney placed him on Emergency Placement in an off-duty status without pay and that Ms. Sweeney signed the letter. Complainant asserted that the letter stated that he sent an inappropriate message to Mr. Chavez on June 5, 2019. Complainant was required to leave his USPS smartphone, laptop, key to his office and USPS ID and leave the premises immediately.  Complainant attested that he was escorted to his vehicle and watched as he exited the parking area. Complainant stated the same day he received the letter he appealed his emergency placement and invoked FMLA stating he would begin his sick leave on June 7, 2019. Complainant noted that Ms. Sweeney signed a letter on June 12, 2019, rescinding his emergency placement. He asserted despite the letter rescinding his emergency placement, he remained suspended from access to the USPS infrastructure as his badge, office key, laptop and USPS smartphone were not returned to him. Complainant testified that the letter he received did not allow him to return to his office or invite him to a fact-finding meeting. When asked why his race, color, national origin, age, EEO activity or disability and genetic information were factors, Complainant asserted, "See my allegations which I provide in this Affidavit."  (IF, Affidavit A, pp. 20 - 23).

### *Prima Facie* **Analysis**

#### Disability

In order to establish a *prima facie* case of disability discrimination, Complainant must show that he was a "person with a disability" within the meaning of the Rehabilitation Act of 1973.  Thus, there must be evidence that Complainant:  (1) has a physical or mental impairment which substantially limits one or more of that person's major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment.

The Americans with Disabilities Act Amendments Act of 2008 became effective January 1, 2009.  The Act emphasizes that the definition of disability should be construed in favor of broad coverage of individuals to the maximum extent permitted by the terms of the ADA and generally shall not require extensive analysis.  The Act makes important changes to the definition of the term "disability" by rejecting the holdings in several Supreme Court decisions and portions of EEOC's ADA regulations.  The effect of these changes is to make it easier for an individual seeking protection under the ADA to establish that he or she has a disability within the meaning of the ADA.

The Act retains the ADA's basic definition of "disability" as an impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment.  However, it changes the way that these statutory terms should be interpreted in several ways.  An impairment that substantially limits one major life activity need not limit other major life activities in order to be

considered a disability. An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

Although the ADAAA did not directly change any of the medical evidence requirements to establish a disability, it significantly altered both the amount and degree of medical evidence that can be required by an agency to establish that an individual has a disability. Most significantly, the amendments altered the degree of evidence required to establish that a medical condition substantially limits a major life activity. Section (2)(b)(5) of the ADAAA specifically states that one purpose of the amendments was: to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis. Thus, under the ADAAA, cases must now be read in light of the lowered threshold for determining whether a condition is substantially limiting.

Here, Complainant averred that his medical condition was prostate cancer. Complainant averred that he had a radical prostectomy in March 2016 and at least another five surgeries prior to June 2018 and that his physicians did not know when his medical condition would abate. Complainant asserted that he advised the District Reasonable Accommodation Committee (DRAC) and their coordinator, Ms. Wiley, of his diagnosis, prognosis and treatment. Complainant testified that he advised Mr. Chavez about his treatment and that due to his medical condition he was unable to drive more than 20 to 30 minutes without urgent access to a restroom. Complainant also identified that he suffered from chronic fatigue. (IF, Affidavit A, pp. 5 - 8).

Gail Hendrix asserted that Complainant shared with her he had been treated for prostate cancer and needed to urinate often. She noted Complainant did not report to his duty station during her assignment to Phoenix. (IF, Affidavit B, p. 3).

Richard Chavez stated that Complainant shared with him that he could not be far away from the restroom. He added Complainant shared he was participating in a trial cancer treatment, but could still perform the functions of his position. Mr. Chavez asserted that he was never advised of a mental condition for Complainant. (IF, Affidavit C, p. 3).

Tina Sweeney testified that another employee, Bob Garmen, mentioned to her in passing that Complainant had cancer. She noted that on June 6, 2019, she received an email from Complainant that he needed FMLA. (IF, Affidavit D, p. 3).

Lerene Wiley averred that she was aware of Complainant's physical limitations including driving limited short distances daily, and ability to travel to and from distant offices was impaired by need for immediate access to a restroom. She stated she was not aware of any mental condition for Complainant. Ms. Wiley noted that she became aware of Complainant's physical condition around June 25, 2018, through his DRAC Medical Summary Information Sheet. She stated Complainant's medical condition and limitations

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 17

did not impact his ability to perform the duties of his position or ability to be present in the
workplace. (IF, Affidavit E, pp. 3 - 4).

The record contains Medical Information and Restriction Assessment for Complainant
from his Medical Provider, dated June 22, 2018, with DRAC Medical Summary
Information Sheet, dated June 25, 2018, which states in relevant part, "Complainant's
ability to travel even short distances is impaired. His present medical condition restricts
or limits daily travel to and from a distant office." (IF, Affidavit E, pp. 44 - 46).

The record evidence contains a letter to Complainant from the Reasonable
Accommodation Committee, Subject: DRAC, dated June 29, 2018, which states in
relevant part, "You can alter your schedule to coincide with the non-peak traffic. The
specific details for your work schedule should be arranged with your manager." (IF,
Affidavit E, p. 53).

The record contains Complainant's FMLA Approval, April 8, 2019, which shows approval
for FMLA leave through May 31, 2019. (IF, Exhibit 4).

Based on the record evidence, we will deem Complainant was substantially limited in a
major life activity. Therefore, he established he had an actual disability within the meaning
of the Rehabilitation Act.

## Retaliation

A complainant can make out a *prima facie* case of retaliation by showing that: (1) he
engaged in prior protected activity; (2) the agency official was aware of the protected
activity; (3) he was subsequently disadvantaged by an adverse employment action or
adverse treatment; and (4) there is a causal link between the protected activity and
adverse action/treatment. Hochstadt, *supra*.

Complainant has established the first element of a *prima facie* case of retaliation.
Complainant testified that he engaged in the reasonable accommodation process in June
2018, and also was identified by three employees in EEO complaints filed against him in
August 2018. (IF. Affidavit A, p. 3). The record evidence in the case file includes
documentation indicating that Complainant has not filed any previous EEO complaints.
(IF, Exhibit 2).

In regards to the second element, Ms. Hendrix testified she was not aware of Complainant
being involved in EEO activity. She stated she was aware Complainant had an approved
reasonable accommodation to adjust to a later start time and learned of his reasonable
accommodation from Human Resources. (IF, Affidavit B, p. 2).

Mr. Chavez attested that he was not aware of Complainant being involved in EEO activity
and stated that he was aware Complainant had an agreement to commute to work during
off peak traffic hours to accommodate his medical condition. (IF, Affidavit C, pp. 2 - 3).

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 18

Ms. Sweeney averred that she was not aware of Complainant being involved in EEO activity and she was not aware of a reasonable accommodation for Complainant. (IF, Affidavit D, p. 2).

Ms. Wiley testified that she was not aware of Complainant being involved in EEO activity previously. She noted that Complainant met with the DRAC on June 27, 2018, and on June 29, 2018, a letter was sent to him summarizing his accommodation as he could alter his work schedule to coincide with non-peak traffic periods. She added the letter stated his work schedule should be arranged with his manager. (IF, Affidavit E, pp. 2 - 3). Accordingly, it will be assumed that Complainant has established the second element of a *prima facie* case of retaliation for Ms. Hendrix, Mr. Chavez and Ms. Wiley.

Turning to the third element, it must be determined whether Complainant was disadvantaged by an adverse employment action or adverse treatment with regard to these claims. Adverse actions need not be ultimate employment actions, just adverse treatment based on a retaliatory motive, which could deter a reasonable person from engaging in protected activity. Burlington Northern Santa Fe Railway Company v. White, 548 U.S. 53 (2006); Lindsey v. U.S. Postal Service, EEOC Request No. 05980410 (November 4, 1999) and *EEOC Compliance Manual*, Section 8.D.3, Notice No. 915.003 (May 20, 1998). In light of this standard, it is assumed for the sake of argument that Complainant's allegations are sufficiently adverse to satisfy Complainant's burden under the third element of his *prima facie* case of retaliation.

Finally, turning to the fourth element of Complainant's *prima facie* case, it must be determined whether there is a causal link between Complainant's protected activity and the adverse treatment. Complainant has not provided any direct evidence that management's actions were motivated by retaliatory animus. Complainant provided no other testimony, documentary evidence, witness statements or other information that would tend to suggest that management was motivated by discriminatory animus when taking the actions alleged in this complaint. As such, he has not proven the fourth element of a *prima facie* case through direct evidence.

A causal connection may be inferred by evidence that the protected conduct was closely followed by the adverse action. Clark County School District v. Breeden, 532 U.S. 286 (2001). The Court in Breeden noted that where a complainant is relying on temporal proximity to establish a causal connection between prior protected activity and a current adverse employment action, that proximity must be "very close" and cited with approval Circuit Court of Appeals decisions holding that time gaps of three to four months between an individual's prior EEO activity and the current adverse employment action were too attenuated to suggest an inference of retaliation. The Commission has followed suit and rendered decisions establishing much shorter time frames to establish the requisite temporal proximity. See, for example, Heads v. U.S. Postal Service, EEOC Appeal No. 01A51547 (June 2, 2005); Archibald v. Department of Housing and Urban Development, EEOC Appeal No. 01A54280 (September 22, 2005); and Lynch v. U.S. Postal Service, EEOC Appeal No. 01A24705 (August 14, 2003). Here, the record indicates that

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 19

Complainant's EEO activity (DRAC process and EEO complaints against him) occurred on June 27, 2018, and in August 2018. The record indicates that the EEO activity in the current complaint occurred in June 2018 (Claims 1 and 2), July 2018 (Claim 3), and June 2019 (Claims 4 and 5). Given this history, the temporal proximity between Complainant's EEO activity and the adverse employment actions alleged is not close enough as to raise an inference of retaliation for claims 1 – 2 and 4 - 5. Claims 1 and 2 occurred prior to Complainant's EEO activity, and claims 3 and 4 occurred approximately one year after Complainant engaged in his protected activity. Accordingly, he has not proven the fourth element of a *prima facie* case of reprisal for claims 1 – 2, or 4 - 5. However, in regards to claim 3, the record provides that Complainant was engaged in the DRAC process on June 27, 2018, and in July 2018 Complainant alleged an adverse employment action (hours were being monitored by management). Accordingly, Complainant has established the fourth element of a *prima facie* case of retaliation for claim 3 only.

Having made the determination that Complainant has satisfied the essential requirements of a *prima facie* case of reprisal, it is important to point out, however, that such a finding is not the equivalent of a finding of discrimination. It is simply proof that, without more, the circumstances involving management's actions may give rise to an inference that discrimination did occur. At this point, the burden shifts to management to establish that its actions were taken for legitimate, non-discriminatory reasons.

## Disparate Treatment

The Commission has held that allegations of harassing conduct that include discrete acts that would independently state claims outside of a harassment framework, assuming that they are timely, are properly reviewed in the context of disparate treatment. Conlin v. Department of Veterans Affairs, EEOC Appeal No. 0120055310 (December 5, 2006).

The Supreme Court has held that a discrete retaliatory or discriminatory act "occurred" on the day that it "happened" so that the plaintiff could only file a charge which covered discrete acts which "occurred" within the appropriate time period for filing. However, the Court also determined that a hostile work environment can properly consist of both discrete and non-discrete acts which fall both within and outside the filing period so long as one of the acts which comprise the claim falls within the filing period. Untimely discrete acts may be considered as background evidence in support of the hostile environment claim. National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002). The Supreme Court does not define the term "discrete act", only using the term to contrast with a hostile work environment claim which would involve "...the cumulative effect of individual acts" in the Court's view. Nevertheless, the Court references 42 U.S.C. 2000e-2(a) and its prohibition of discrimination in hiring, discharge, and compensation and later adds failure to promote and denial of a transfer as examples of discrete acts which must themselves be the subjects of timely filings. Generally speaking, a discrete act is an action which is of such a nature or has such a consequence as would move a reasonable person to act to protect his or her rights.

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 20

As noted previously, Complainant may establish a prima facie case of disparate treatment by showing that he: (1) belongs to a protected class; (2) was subjected to an adverse employment action; and (3) was treated differently in this regard than similarly situated individuals who were not members of the protected group. Mayberry, *supra*. For age discrimination claims, the Supreme Court has clarified that in establishing the third element of the prima facie case, it is not just a question of whether a comparator is outside the protected age category but also whether the comparator is substantially the younger than Complainant. O'Connor, *supra*. While there is no bright line test for what constitutes "substantially younger", the term has generally been applied to age differences in excess of five years. See Hammersmith v. Social Security Administration, EEOC Appeal No. 01A05922 (March 6, 2002).

Of the incidents alleged, only Claim 5 would independently state a timely claim outside of a harassment framework and will be analyzed immediately below as discrete acts. Claims 1 – 4 will be analyzed in the harassment/hostile work environment section.

Complainant's disability and prior EEO activity were discussed earlier in this decision. Complainant has proven the first element of a *prima facie* case of disparate treatment discrimination on the bases of race, color, age, national origin, disability, genetic information, and reprisal.

In regards to the second element, Complainant was subject to an adverse employment action when he was placed on Emergency Placement in an Off-Duty Status without pay. Accordingly, he has met the second element of his *prima facie* case.

As for the third element of his *prima facie* case, it must be determined whether Complainant was treated less favorably than similarly situated individuals who were outside his protected classes. In order to be considered similarly situated for the purpose of creating an inference of unlawful disparate treatment, Complainant must show that all of the relevant aspects of his employment situation were virtually identical to his comparators' employment situations. Tolar, *supra*. In particular, Complainant must show that the comparative employees: reported to the same supervisor; were subject to the same standards; and engaged in conduct similar to Complainant's, without material differentiating or mitigating circumstances. See Jones v. Department of the Interior, EEOC Request No. 05950175 (June 7, 1996). Complainant must also show that the comparator performed the same job function and was subject to the adverse treatment during the same time period. Mitchell v. U.S. Postal Service, EEOC Appeal No. 01A40524 (July 22, 2004), citing Allen v. Department of the Navy, EEOC Request No. 05900539 (June 15, 1990).

Complainant did not identify any similarly situated employees outside of his protected classes who was treated differently than he was under the same or similar circumstances. (IF, Affidavit A, p. 22). A review of the record does not reveal any comparators who were similarly situated and treated more favorably under similar circumstances. Accordingly, the third element of Complainant's *prima facie* case has not been met. In general, in the

absence of direct evidence of discrimination, if Complainant cannot identify any similarly situated comparison employees who were treated more favorably, he or she will not prevail. Aguilar v. U.S. Postal Service, EEOC Appeal No. 01944167 (August 8, 1995).

## Age Discrimination

In addition to failing to identify any similarly situated individuals treated more favorably than Complainant, he failed to establish an essential element to prove age discrimination. Liability in an age discrimination case "depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision…That is, [complainant's] age must have actually played a role in the employer's decision-making process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133, 141 (2000). See also Sullivan v. Crowell, EEOC Appeal No. 01940217 (November 9, 1994) (age must have been the determinative factor in agency's actions).

The Supreme Court has held that because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a similarly situated comparative employee is substantially younger than Complainant is a far more reliable indicator of age discrimination than the fact that Complainant was treated differently than someone outside his protected class. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 313 (1966); EEO Enforcement Guidance on O'Connor v. Consolidated Coin Caterers Corp., EEOC Notice No. 915.002 (September 18, 1966). While there is no bright-line test for what constitutes "substantially younger," the term has been applied to age differences in excess of five years. See Hammersmith v. Social Security Administration, EEOC Appeal No. 01A05922 (March 6, 2002). See Hickman v. Department of Justice (Drug Enforcement Administration), EEOC Appeal No. 01A11797 (December 20, 2001) (finding that a four year age difference between Complainant and the selectee was not sufficient to establish an inference of age discrimination).

The investigation file lacks any evidence that Complainant's age played a role in the Postal Service's actions. Complainant did not identify any comparator employees who were treated differently than he was, nor does he raise an argument that age factored into any of the decisions made in this complaint. Furthermore, Ms. Hendrix, Mr. Chavez, Ms. Sweeney and Ms. Wiley are also within the same protected class of age as Complainant. The fact that key officials were in the same protected class as Complainant substantially weakens any adverse inference drawn from the totality of his allegations. See, e.g., Coggins v. Government of the District of Columbia, 1999 U.S. App. LEXIS 2603 (4th Cir. 1999) (fact that both supervisors in the chain of command are both Caucasian makes any anti-Caucasian bias unlikely); Rooks v. Girl Scouts of Chicago, 1996 U.S. App. LEXIS 20389, (7th Cir. Aug. 9, 1996) (no compelling inference of age discrimination because the decision-maker is in the protected category.); Dewitt v. Mecklenburg County, 73 F. Supp. 2d 589, 598-599 (1999) (where a number of the challenged employment decisions were made or implemented by a member of plaintiff's class, plaintiff's unsupported, self-serving allegations are particularly unpersuasive.) See Rhodes v. Guiberson Oil Tools, 75 F.3d 989 (5th Cir.), cert. denied (1992). Marlow v. Office of Court

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 22

Admin. of State of N.Y., 820 F. Supp. 753 (S.D.N.Y. 1993), aff'd, 22 F.3d 1091 (2d Cir.), cert. denied (1994) (pointing out that because some of the decision makers were members of the same protected age group as plaintiff, plaintiff's ability to raise an inference of discrimination was hampered).

Complainant has failed to prove, by preponderance of evidence, that age was considered and, in turn, a determining factor in the matters alleged. Thus, he has failed to establish his age claim. Furthermore, Complainant failed to present evidence, comparative or otherwise, showing unlawful disparate treatment. Therefore, he failed to make a *prima facie* case of disparate treatment discrimination on the bases of race, color, sex, national origin, age, disability, genetic information or retaliation. While Complainant is not limited to presenting comparative evidence to establish a *prima facie* case of disparate treatment discrimination (*See* Lipcsey v. U.S. Postal Service, EEOC Appeal No. 01981884 (January 6, 2000)), he has not presented any other evidence that affords a sufficient basis from which to draw an inference of discrimination.

## Management's Non-Discriminatory Reason

Assuming, but only for the sake of argument, that Complainant has established a *prima facie* case of discrimination based on race, color, age, or sex, national origin, disability, reprisal, or genetic information, management has articulated a legitimate, non-discriminatory explanation for their actions.

Richard Chavez averred that he is an American of Hispanic descent, tan, and age 50 with a date of birth of November 4, 1969. He stated he did not know Complainant's race, national origin or age and asserted that Complainant's color was tan. Mr. Chavez stated he had no knowledge of genetic information for Complainant or a family member. Mr. Chavez testified he directed Complainant be placed in an off duty status because Complainant sent a highly inappropriate email to him. Mr. Chavez averred that he gave instructions to Ms. Sweeney and Ms. Wiley to place Complainant on Emergency Placement for insubordination and unprofessional conduct in the derogatory email Complainant sent Mr. Chavez. Mr. Chavez asserted that he relied on the ELM 651.4. Mr. Chavez attested that Complainant's conduct was insubordinate and disruptive and an investigation was not necessary or required. He added he based his decision upon reading the inappropriate email. Mr. Chavez noted that he also concurred with rescinding the emergency placement as Complainant had requested to use sick leave and the disruption caused by Complainant's email had been mitigated. Mr. Chavez stated that Complainant's race, color, national origin, age, disability, genetic information and EEO activity were not factors in his actions or decisions. (IF, Affidavit C, pp. 2, 4, 7 - 9).

Tina Sweeney testified she is Hispanic, brown, American, age 47 with a date of birth of November 17, 1971. She stated she was not aware of Complainant's race, national origin or age and asserted his color was brown. Ms. Sweeney stated she had no knowledge of genetic information for Complainant or a family member. Ms. Sweeney attested that both she and Complainant were both direct reports to Mr. Chavez. She testified she initiated

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 23

the Emergency Placement on June 6, 2019, based on inappropriate email conduct by Complainant and conduct unbecoming. She stated Complainant was asked to turn in his badge, laptop, keys and phone before being escorted out of the building due to his level of access. Ms. Sweeny asserted that Complainant was placed on emergency placement until an investigation could be completed and added that she intended on doing a fact finding the following week, but due to Complainant's request for FMLA sick leave she held off. She stated she rescinded his emergency placement based on his email dated June 6, 2019, that he was going on FMLA sick leave. Ms. Sweeney averred that because Complainant was on FMLA sick leave, he was not allowed to return to the office and his keys, laptop, badge and phone were not returned to him. Ms. Sweeney testified that Complainant's race, color, national origin, age, disability, genetic information, and EEO activity were not factors in her actions or decisions. (IF, Affidavit D, pp. 2 - 5).

Lerene Wiley stated she is a Caucasian American, age 63 with a date of birth of July 5, 1956. She averred she did not know Complainant's race, color, national origin and age. Ms. Wiley asserted she was not in possession and did not have knowledge of genetic information concerning Complainant or his family members. Ms. Wiley averred that on June 6, 2019, Ms. Sweeney presented Complainant a notice of Emergency Placement off duty because Complainant had sent an inappropriate email to Mr. Chavez. She stated she prepared the notice for Ms. Sweeney's signature and asserted the Emergency Placement was based on ELM Section 651.4 and noted the employee receiving the notice should be returned to duty after the cause for non-pay status ceased unless circumstances warranted otherwise. Ms. Wiley attested that she accompanied Ms. Sweeney to Complainant's office and Ms. Sweeney handed Complainant the Notice of Emergency Placement. She added that Ms. Sweeney instructed Complainant to turn in accountable items such as his badge, keys and laptop. Ms. Wiley also averred that Ms. Sweeney advised Complainant he was required to leave the facility and they walked behind him as he left the building. Ms. Wiley noted procedures do not require a manager to conduct an investigatory interview or fact-finding interview prior to issuing an emergency placement notice. Ms. Wiley also testified that due to Complainant's submission on June 6, 2019, of his intention to commence FMLA sick leave on June 7, 2019, Ms. Sweeney rescinded the emergency placement and notified Complainant on June 12, 2019. She testified she had no knowledge Complainant submitted a request to work or that he submitted a request to terminate his FMLA sick leave in June 2019. Ms. Wiley asserted that Complainant's race, color, national origin, age, disability, genetic information and EEO activity were not factors in her actions or decisions. (IF, Affidavit E, pp. 2, 4, 9 - 12).

The *Employee and Labor Relations Manual* (ELM) section 651.4 provides, "An employee may be placed in an off-duty nonpay status immediately, but remains on the rolls when he or she: a. Exhibits characteristics of impairment due to alcohol, drugs, or other intoxicant; b. Fails to observe safety rules; c. Fails to obey a direct order; d. Provides reason to be deemed potentially injurious to self or others; or e. Disrupts day-to-day postal operations in any other way. Placement in an off-duty nonpay status is confirmed in writing, stating the reasons and advising the employee that the action is appealable. The

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 24

employee should be returned to duty after the cause for nonpay status ceases unless individual circumstances warrant otherwise. Use of these emergency procedures does not preclude disciplinary action based on the same conduct." (IF, Exhibit 6).

The record contains email(s) to/from Complainant and Mr. Chavez, Subject: ABQ Symposium, dated June 5, 2019, which state in relevant part, "Mr. Chavez: I need the issues raised below solved prior to Sunday." Complainant: "If this is a direct order I will submit an emergency request for $10,000, for whatever your and Renee's heart desires." (IF, Affidavit D, pp. 9 – 11).

The record also contains the Letter to Complainant from Ms. Sweeney, Subject: Emergency Placement in an Off-Duty Status, dated June 6, 2019, which states in relevant part, "You are hereby notified of your emergency placement in an off duty status without pay. Reasons for your placement off duty as follows: You sent an inappropriate email message to (A) District Manager Marty Chavez on June 5, 2019." (IF, Affidavit D, p. 14).

The record evidence contains an email to Mr. Chavez, Ms., Wiley and Ms. Sweeney from Complainant, Subject: Complainant Retaliatory Placement on Unpaid off Duty Status; Notice of Appeal; Demand for FMLA Rights, dated June 6, 2019, in relevant part, "This message will serve as my Notice of Appeal pursuant to all of my legal rights. I demand my right to sick leave under FMLA. Your actions are clearly retaliatory. (IF, Affidavit D, pp. 12 – 13).

The record contains a letter to Complainant from Mr. Chavez, Subject: Notice of Appeal, dated June 7, 2019, which states in relevant part, "Please be advised that OIC Tina Sweeney has been delegated the authority to make the decision for your appeal and respond to your request for FMLA sick leave. (IF, Affidavit E, p. 62).

The record evidence contains a letter to Complainant from Ms. Sweeney, Subject: Rescission of Emergency Placement Status, dated June 12, 2019, which states in relevant part, "Due to the notification that you provided on June 7, 2019, that you intended to begin FMLA sick leave on June 7, 2019, the Emergency Placement Notice issued to you on June 6, 2019, is rescinded. (IF, Affidavit D, p. 15 – 16).

Based on the evidence in the record, management has established their non-discriminatory reason(s) for their actions.  This analysis will now address whether there is evidence of pretext.

## Pretext

At this point, Complainant has the burden of proving that management's stated reason is not only pretext, but is pretext for intentional discrimination. Tincher v. Wal-Mart Stores, Inc., 118 F.3d 1125, 1129 (7th Cir. 1997).  Pretext could be demonstrated by showing "such weaknesses, implausibilties, inconsistencies, incoherencies, or contradictions in the Agency proffered reasons for its action that a reasonable fact-finder could rationally

find them unworthy of credence and then infer that the employer did not act for the asserted non-discriminatory reason. Morgan v. Hilti, Inc., 108, F.3d 1319, 1323, (10th Cir. 1997). To do this, Complainant must have shown that, in spite of the articulated non-discriminatory explanation, an overall inference of discrimination could be discerned by a preponderance of the evidence. Aikens, supra. In other words, Complainant must have shown that the Agency was "more likely motivated by discriminatory reasons. [Citation omitted]" than not. Hill v. Social Security Administration, EEOC Appeal No. 01970512 (June 8, 2000). Or, Complainant could have shown that the proffered explanation of the Agency was unworthy of credence. Burdine, 450 U.S. at 256. Essentially, the record must have shown that the Agency articulated a false reason and that its real reason was discrimination. Hicks, 509 U.S. at 515 (1993).

Complainant did not specify why any of his protected classes were the real reason for management's actions. (IF, Affidavit A, pp. 23 - 24).

Complainant's contention that he was treated less favorably than other employees not in his protected groups was analyzed thoroughly as part of the third element of a *prima facie* case of disparate treatment discrimination, and Complainant failed to demonstrate that any other employees were treated more favorably than he was under the same or similar circumstances. Complainant provided no documents, witness testimony, or other evidence in support of his assertion that any of his protected classes were the real reason for management's actions.

Complainant's allegations were not supported by the totality of the record and he failed to present any plausible evidence that would have demonstrated that management's reasons for its action were factually baseless or not its actual motivation. Tincher v. Wal-Mart Stores, Inc. and Morgan v. Hilti, Inc., Id. It should be noted that a complainant's subjective beliefs cannot be probative evidence of pretext, and therefore, cannot be the basis of judicial relief. Elliot v. Group Medical & Surgical Service, 714 F.2d 556, 557 (5th Cir. 1983), *cert. denied*, 467 U.S. 1215, (1984); see also, Billet v. CIGNA Corp., 940 F.2d 812, 816 (3rd Cir. 1991). Complainant cannot second-guess the wisdom of the agency's business decisions. Thus, agencies are free to discharge, promote, demote, or transfer individuals for any reason, fair or unfair, so long as the decision is not a pretext for discrimination. Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984).

In other words, there was nothing that showed by a preponderance of the evidence that the legitimate explanations given by the agency were pretext for discrimination. Hammons v. HUD, EEOC Request No. 05971093 (May 5, 1999). Hence, Complainant did not show that the explanation of the agency for its action was simply a pretext for discrimination.

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 26

## Harassment/Hostile Work Environment

To establish a *prima facie* case of hostile work environment harassment, a complainant must establish that: (1) He/she is a member of a protected group; (2) that he/she was subjected to unwelcome verbal or physical conduct; (3) that the conduct was based on Complainant's protected status; and (4) that the conduct was sufficiently severe or pervasive that it created a hostile, abusive, or offensive work environment or unreasonably interfered with Complainant's work performance; and (5) that there is a basis for imputing liability to the employer. <u>McCleod v. Social Security Administration</u>, EEOC Appeal No. 019962810 (August 5, 1999).

The first element of Complainant's harassment claim has been met. As previously noted, Complainant is a member of a protected class by virtue of his race, color, age, national origin, disability, genetic information and retaliation.

Turning to the second and third elements of the harassment claim, Complainant must establish that he was subjected to insulting verbal or physical conduct relating to his protected class. The conduct in question is evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred, including the severity and frequency of the conduct and its effect on the employee's work performance. <u>Harris</u>, *supra*.

It is noted that, having already shown that management acted appropriately with regard to the claim analyzed above (claim 5) as a discrete act, it cannot, without more, form the basis for a hostile work environment. A review of the record showed no evidence that management used any vulgar or unpleasant language or that they engaged in antagonistic conduct during the event which formed the basis for the claim already discussed, so there is nothing that would bring this event, which has already been shown to be non-discriminatory, within the harassment framework. Consequently, Complainant cannot satisfy the second or third elements as to the discrete act analyzed above.

Addressing the second and third elements as to those allegations not already discussed in the previous analysis, Complainant must show that he was subjected to unwelcome verbal or physical conduct. Complainant's version of the events supporting his allegations were set out in detail in the Background section. Management's response to each issue follows.

> ### 1. On or about June 2018, Complainant was tasked with meaningless assignments and attempts were made to show that he was not performing his functions.

Gail Hendrix attested that she is Caucasian, white, American, age 58 with a date of birth of March 29, 1961. She stated she had never met Complainant and was not aware of his race, color, national origin and age. Ms. Hendrix also stated she had no knowledge of genetic information for Complainant or a family member. Ms. Hendrix averred that she learned Complainant was not reporting to his duty station so she asked Ms. Wiley to

engage with Complainant and she was aware they worked with the DRAC. She asserted she did not begin a campaign to eliminate Complainant from his job. Ms. Hendrix asserted that she did not recall the specifics of Complainant's allegation regarding Telecommunications Outages. She noted she recalled complaints of outages and asked the IT team to learn more about the complaints and resolve any gaps identified. Ms. Hendrix added that this was not a problem in her home District. She testified Complainant's race, color, national origin, age, disability, genetic information and EEO activity were not factors in her actions and decisions. (IF, Affidavit B, pp. 2 - 5).

Ms. Wiley attested that she neither had knowledge of, nor did she observe a campaign by Ms. Hendrix to eliminate Complainant from his job. Ms. Wiley asserted that she had no knowledge of a hostile work environment or of Complainant not receiving support for his assigned duty to assure District employees did not violate the Fair Labor Standards Act. She noted Ms. Hendrix requested to activate the process to consider Complainant for a reasonable accommodation. (IF, Affidavit E, pp. 5 - 6).

### 2. On or about June 2018, Complainant was forced into a Reasonable Accommodation Process.

Ms. Hendrix averred that she learned Complainant was not reporting to his duty station and asked Ms. Wiley to engage with him and the DRAC. She noted it was her understanding Complainant had agreed to participate with the DRAC. Ms. Hendrix noted that she was aware of an approved Reasonable Accommodation for Complainant that adjusted his start time to reduce commute times. She stated Complainant's race, color, national origin, age, genetic information and EEO activity were not factors in her actions and decisions and added the DRAC was part of the process to support employees. (IF, Affidavit B, pp. 6 - 7).

Ms. Wiley testified that Ms. Hendrix requested they activate the reasonable accommodation process for Complainant in line with Handbook EL-307, Chapter 212. She stated Complainant submitted medical information on June 26, 2019, and the DRAC meeting occurred on June 27, 2019. Ms. Wiley averred that Complainant's stance was that he did not believe he needed a reasonable accommodation and did not specifically request an accommodation. She stated during the DRAC meeting, it became clear that Complainant's commuting limitations could be accommodated by his working a schedule to avoid heavy traffic. Ms. Wiley asserted that Complainant reported to work on July 9, 2018, consistent with the proposed accommodation. She stated Complainant's race, color, national origin, age, genetic information or EEO activity were not factors in her actions or decisions. (IF, Affidavit E, pp. 6 - 7).

Handbook EL-307, Reasonable Accommodation, An Interactive Process, "Is a critical tool for meeting our legal and regulatory responsibilities by providing managers and supervisors with procedures, guidance, and instructions on matters of reasonable accommodation that involve applicants and employees with disabilities." (IF, Exhibit 7).

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 28

The record contains an email to Complainant from Ms. Wiley, Subject: Meeting, dated May 11, 2018, which states in relevant part, "District Manager Gail Hendrix has requested that we initiate the process to consider providing you reasonable accommodation." (IF, Affidavit E, pp. 18 – 19).

The record evidence contains email to Complainant from Ms. Wiley, Subject: Reasonable Accommodation, dated May 19, 2018, with Letter to Complainant with attachments which states in relevant part, "The first step of the reasonable accommodation process involves submission of medical information." (IF, Affidavit E, pp. 20 – 34).

> ### 3. On or about July 9, 2018, Complainant became aware his office hours were being monitored by the District Manager when he suggested Complainant begin an early schedule.

Mr. Chavez averred that he when Ms. Hendrix left her position as acting District Manager she told him he would need to follow up with Complainant to find a suitable commute time for him so he could perform his duties as IT Manager while physically being present at work. He asserted the change in Complainant's hours to 5 am to 1:30 pm was at Complainant's request and a change from 10 am to 6:30 pm. He added the alternate commuting schedule was part of the process in accommodating Complainant's medical condition. Mr. Chavez asserted that he told Complainant he expected him to perform work at the office if that was possible, because that was where his job duties existed. He stated Complainant was a manager and needed to interact with his subordinates and other managers.  Mr. Chavez denied that Complainant's race, color, national origin, age, genetic information, disability, or EEO activity were factors in his actions or decisions. (IF, Affidavit C, pp. 4 - 5)

Ms. Wiley asserted that she was not aware Mr. Chavez changed Complainant's schedule. She noted DRAC had discussed Complainant could alter his work schedule to coincide with non-peak traffic periods and added it was also discussed the specific detail of Complainant's schedule should be arranged with his manager.  (IF, Affidavit E, p. 8).

> ### 4. On or about June 5, 2019, Complainant was directed to provide last minute IT assistance for an off-site event that would require funds to purchase the equipment needed for the event.

Mr. Chavez averred that the District had several "Developing People Symposiums" including one in Albuquerque, NM. He stated IT support was required for equipment on-site and noted that he did not recall when Complainant was advised about the event. Mr. Chavez asserted that nothing out of the ordinary was requested from IT for the event and it could be provided by local resources or purchasing locally and attested that it was his expectation IT would support the Symposium. Mr. Chavez also testified that everything was provided and the symposium was a success. Mr. Chavez stated he discussed the event with Complainant verbally and by email and added that he approved all expenditures for the event. Ms. Chavez denied that Complainant's race, color, national

origin, age, disability, genetic information or EEO activity were factors in his actions or decisions. (IF, Affidavit C, pp. 6 - 7).

For element two, in reviewing the totality of the evidence (as set forth by both Complainant, and management), the record does not support a finding that Complainant was subjected to unwelcome verbal or physical conduct.  Complainant has not proven the second element of a *prima facie* case that he was subjected to unwelcome conduct.

Turning to the third element of his *prima facie* case, even if we were to assume for the sake of argument that Complainant was subjected to the unwelcome, unwarranted conduct as alleged, the record is absolutely devoid of any evidence that management singled him out or treated his unfairly because of his protected class.  Complainant did not provide, and the investigation did not uncover, any evidence that any of management's conduct in the instant complaint was based on Complainant's protected statuses. Complainant offered no documents or other direct evidence indicating that management used slurs, epithets, promoted stereotypes, or engaged in any other facially discriminatory behavior based on her membership in any of the protected group. Management either denied they had engaged in the conduct alleged or provided reasonable, non-discriminatory reasons for their conduct.  Management's denial and/or legitimate, non-discriminatory reasons for its actions have been described previously and that discussion is herein incorporated by reference as if set out in full for all purposes. Based on an examination of all the information in the record evidence, Complainant has not proven the third element of a *prima facie* case of harassment for any of his claims.

For the fourth element, Complainant has not proven by a preponderance of the evidence that the conduct to which he was subjected was so severe or pervasive that it created a hostile, abusive, or offensive work environment or unreasonably interfered with his work performance.  EEO decisions make it clear that the anti-discrimination laws are not a "general civility code" and that the conduct complained of must be so objectively offensive as to alter the terms and conditions of one's employment.  Routine work assignments, instructions and admonishments do not rise to the level of discriminatory harassment. DiFruscio, *supra*.

Under Federal EEO law, harassment consists of conduct which is not job-related, which is hostile or abusive, which is inappropriate in the work environment, and which is unnecessary to the proper functioning of the work unit.  Examples of harassment include epithets, slurs, negative stereotyping, gestures or other actions which are threatening, intimidating, or hostile, physical abuse, racial or ethnic jokes, and written or graphic material that is posted or circulated in the workplace and which denigrates or shows hostility or aversion toward an individual or group.  Harassment does not consist of job-related events that an employee finds objectionable, normal stress associated with work, or the belief that job-related events are harassing in nature because they are motivated by discriminatory intent or bias.

In this case, Complainant's allegations of harassment consist of job-related events which Complainant found objectionable. However, these actions, as alleged, are not harassing in nature.   Complainant's belief that management's actions may be based on discriminatory factors does not transform those actions into harassment. Where, as here, the conduct at issue consists of job-related conduct, we need not review that conduct as harassment merely because Complainant has so labeled it.

Complainant asserted the hostile work environment began in the Summer of 2018 with Ms. Hendrix when she began a campaign to eliminate him from his job that was continued by Mr. Chavez. He noted he received extensive training regarding harassment and hostile work environment. (IF, Affidavit A, pp. 9, 28).

Ms. Hendrix asserted that she did not recall Complainant or anyone acting on his behalf telling her that hers or anyone else's actions constituted harassment and/or a hostile work environment for him. She also stated she was not aware of Complainant or anyone else on behalf of Complainant bringing to the attention of any other management officials concerns about harassment and/or a hostile work environment. Ms. Hendrix averred that she had received training in antiharassment and a hostile work environment and that the policy was posted in her facility. (IF, Affidavit B, pp. 7 - 8).

Mr. Chavez replied, "no" when asked if he was aware Complainant or anyone acting on his behalf brought to the attention of any other management officials concerns about harassment and/or a hostile work environment. Mr. Chavez asserted that he had received training in anti-harassment and a hostile work environment and that the policy was posted in his facility. (IF, Affidavit C, pp. 10 - 11).

Mr. Sweeney stated she did not recall Complainant or anyone acting on his behalf telling her that hers or anyone else's actions constituted harassment and/or a hostile work environment for him. She also stated she did not recall Complainant or anyone else on behalf of Complainant bringing to the attention of any other management officials concerns about harassment and/or a hostile work environment. Ms. Sweeney asserted that she had received training in anti-harassment and a hostile work environment and that the policy was posted in her facility. (IF, Affidavit D, pp. 7 - 8).

Ms. Wiley averred that Complainant did not tell her that hers or anyone else's actions constituted harassment and/or a hostile work environment for him. She also stated she was not aware of Complainant bringing to the attention of any other management officials concerns about harassment and/or a hostile work environment. Ms. Wiley asserted that she had received training in anti-harassment and a hostile work environment and that the policy was posted in her facility. (IF, Affidavit E, pp. 15 - 16).

Here, the acts to which Complainant objects are matters which occupy the normal scope and course of industrial relations and partake of daily interactions between a supervisor/manager and his or her employees.  Issues such as the manner in which an

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 31

employee is supervised and the supervisor's imposition of rules, regulations and policy are the gist of daily activity on an industrial work floor such as that worked at by Complainant. The incidents Complainant raised are minor, transitory and ephemeral in nature, and do not rise to the level of pervasiveness and severity necessary to meet this requirement. Accordingly, Complainant has not satisfied the fourth required element of a *prima facie* case of harassment.

The Agency issued the following anti-harassment and anti-discrimination policies and regulations:

Section 665.23 of the *Employee and Labor Relations Manual* (ELM) prohibits discrimination and harassment in employment. (IF, Exhibit 6).

The *Postal Services Policy on Workplace Harassment*, dated March 16, 2017, and signed by Megan J Brennan, Postmaster General/CEO. (IF, Exhibit 10).

In February 2015, the Agency issued Poster 159, *Workplace Harassment: Know Your Rights! Take Responsibility!* (IF, Exhibit 11).

Publication 553, *Employee's Guide to Understanding, Preventing, and Reporting Harassment.* (IF, Exhibit 12).

Publication 552: *Manager's Guide to Understanding, Investigating, and Preventing Harassment.* (IF, Exhibit 13).

*Equal Employment Opportunity Policy Statement*, dated March 29, 2018, and signed by Megan J. Brennan, Postmaster General/CEO. (IF, Exhibit 14).

The record established upon receipt of Complainant's EEO complaint alleging harassment, the Agency properly investigated his claims. The record documented that the Agency established and published anti-discrimination and anti-hostile work environment policies and regulations to all employees. The record also documented that the agency exercised reasonable care to prevent and correct promptly the alleged harassing behavior.

For the fifth and final element of a *prima facie* case of harassment, Complainant did not establish that management was motivated by unlawful discrimination (third element) or that the conduct was severe and/or pervasive (fourth element). Therefore, there is no basis for imputing liability to the Agency.

Complainant has failed to meet his burden; therefore, his *prima facie* case of discriminatory harassment fails.

## Constructive Discharge

In any claim of constructive discharge, the central question is whether the employer, through its unlawful discriminatory behavior, made the employee's working conditions so difficult that any reasonable person in the employee's position would feel compelled to resign. *Carmon-Coleman v. Dep't of Defense*, E.E.O.C. Appeal No. 07A00003, 2002 WL 736291, at \*5 (Apr. 17, 2002).

In order to prove a claim of constructive discharge, a complainant must show that (1) a reasonable person in Complainant's position would have found the working conditions intolerable; (2) conduct that constituted discrimination against Complainant created the intolerable working conditions; and (3) Complainant's involuntary resignation resulted from the intolerable working conditions. *Id.* In *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), the Supreme Court noted that a constructive discharge claim based on hostile environment "entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." 542 U.S. at 147, *citing Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment,…the facts alleged [for constructive discharge must be]…so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F. 3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress").

First, it is our determination that a reasonable person in Complainant's position would not have found the working conditions intolerable. Even if we credit everything to which Complainant testified as absolute truth and ignored the reasonable explanations of his managers, the entire series of events would not constitute intolerable working conditions to a reasonable employee.

Here, Complainant testified that he submitted his application for retirement effective July 1, 2019, and that the United States Postal Service constructively terminated his employment. Complainant averred that there was no fact-finding held with him and he was not provided any of his due process rights. He stated after his emergency placement was rescinded and he returned to a paid status on FMLA sick leave his USPS phone, laptop, keys and ID were not returned to him effectively suspending him from access to the USPS infrastructure. Complainant asserted that the letter from Ms. Sweeney, rescinding his emergency placement, did not allow him to return to his office. (IF, Affidavit A, pp. 24 - 25). Ms. Wiley testified that Complainant submitted a voluntary request for regular retirement to be effective on June 30, 2019. She stated that Complainant was on FMLA sick leave from June 7, 2019, through June 30, 2019, and that she had no knowledge Complainant requested to come back to work or submitted a notice that he intended to terminate his FMLA sick leave. (IF, Affidavit E, pp. 12 - 13). Mr. Chavez testified once Complainant's emergency placement was rescinded he was free to return to work or use leave as appropriate and added he was not aware of Complainant

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 32

## Constructive Discharge

In any claim of constructive discharge, the central question is whether the employer, through its unlawful discriminatory behavior, made the employee's working conditions so difficult that any reasonable person in the employee's position would feel compelled to resign. *Carmon-Coleman v. Dep't of Defense*, E.E.O.C. Appeal No. 07A00003, 2002 WL 736291, at *5 (Apr. 17, 2002).

In order to prove a claim of constructive discharge, a complainant must show that (1) a reasonable person in Complainant's position would have found the working conditions intolerable; (2) conduct that constituted discrimination against Complainant created the intolerable working conditions; and (3) Complainant's involuntary resignation resulted from the intolerable working conditions. *Id.* In *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), the Supreme Court noted that a constructive discharge claim based on hostile environment "entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." 542 U.S. at 147, *citing Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment,…the facts alleged [for constructive discharge must be]…so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F. 3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress").

First, it is our determination that a reasonable person in Complainant's position would not have found the working conditions intolerable. Even if we credit everything to which Complainant testified as absolute truth and ignored the reasonable explanations of his managers, the entire series of events would not constitute intolerable working conditions to a reasonable employee.

Here, Complainant testified that he submitted his application for retirement effective July 1, 2019, and that the United States Postal Service constructively terminated his employment. Complainant averred that there was no fact-finding held with him and he was not provided any of his due process rights. He stated after his emergency placement was rescinded and he returned to a paid status on FMLA sick leave his USPS phone, laptop, keys and ID were not returned to him effectively suspending him from access to the USPS infrastructure. Complainant asserted that the letter from Ms. Sweeney, rescinding his emergency placement, did not allow him to return to his office. (IF, Affidavit A, pp. 24 - 25). Ms. Wiley testified that Complainant submitted a voluntary request for regular retirement to be effective on June 30, 2019. She stated that Complainant was on FMLA sick leave from June 7, 2019, through June 30, 2019, and that she had no knowledge Complainant requested to come back or submitted a notice that he intended to terminate his FMLA sick leave. (IF, Affidavit E, pp. 12 - 13). Mr. Chavez testified once Complainant's emergency placement was rescinded he was free to return to work or use leave as appropriate and added he was not aware of Complainant

Final Agency Decision
Pedro Simpson
Agency Case Number 4E-852-0133-19
Page 33

requesting to return to work. (IF, Affidavit C, p. 9). Accordingly, the evidence does not indicate that Complainant submitted his retirement application because his work environment had become so intolerable that he was forced to quit.

Even if the events Complainant alleges could rise above the typical workplace interactions and disagreements that accompany working for a large organization for innumerable employees around the country, there is still a complete lack of any evidence in the record to suggest that any of management's actions were unlawfully motivated by any of Complainant's protected classes. The claims are unsupported in the record, and even if they were true, do nothing to support Complainant's contention that management acted out of discriminatory animus. Management provided legitimate non-discriminatory reasons for its actions.

The final element of the analysis for a constructive adverse action requires evidence that the action (in this case Complainant's resignation) resulted from the intolerable conditions. Absence a showing in the first two elements, Complainant cannot meet the burden of element 3.

The evidence presented did not established that during the duration of Complainant's employment that he was subject to unlawful discrimination which resulted in working conditions that were intolerable and forced him to resign. As such, Complainant has not established he was constructively discharged from his position.

## Conclusion

After carefully considering the entire record, and applying the legal standards outlined in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973); Hazen Paper Company v. Biggins, 507 U.S. 604 (1993) (applying to cases brought under the ADEA); Prewitt v. U.S. Postal Service, 662 F.2d 292 (5th Cir. 1981) (applying to cases brought under the Rehabilitation Act); Burlington Northern Santa Fe Railway Company v. White, 548 U.S. 53 (2006) (applying to reprisal cases); and Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) (applying to harassment cases); the evidence does not support a finding that Complainant was subjected to discrimination as alleged. Consequently, this complaint is now closed with a finding of no discrimination.

## Appeal Rights

### MIXED CASE APPEAL RIGHTS

If Complainant is dissatisfied with this final agency decision, as an individual arguably entitled to appeal the issue raised in this complaint to the Merit Systems Protection Board, Complainant may appeal this decision to the Merit Systems Protection Board, **not the Equal Employment Opportunity Commission**, no later than thirty (30) days of the date

Final Agency Decision
Pedro Simpson
Agency Case Number  4E-852-0133-19
Page 34

of receipt of this decision.  Enclosed is a copy of the MSPB appeal form.  The appeal should indicate whether Complainant desires a hearing and should be addressed to:

Denver Field Office
MERIT SYSTEMS PROTECTION BOARD
165 S Union Boulevard #318
Lakewood CO 80228-2211

You may also file your appeal electronically by accessing www.mspb.gov.  The MSPB's regulations governing appeals may also be reviewed at that WEB site.  If you decide to appeal directly to MSPB, the name and contact information for the Postal Service's representative to whom the MSPB should send the Acknowledgment Order and a copy of your appeal is:

Samuel J. Schmidt
Managing Counsel
USPS Law Department
9350 South 150 East, Suite 800
Sandy, UT 84070-2716
Tel: (801) 984-8400
Fax: (801) 984-8401
Email: EEOCWESTERNLAW@usps.gov

In lieu of an appeal to the Merit Systems Protection Board, Complainant may file a civil action in an appropriate United States District Court within thirty (30) calendar days of the date of receipt of this decision.  If Complainant chooses to file a civil action, that action should be styled **Pedro Simpson v. Megan J. Brennan, Postmaster General**. Complainant may also request the court to appoint an attorney for Complainant or to authorize the commencement of that action without the payment of fees, costs, or other security in such circumstances as the court deems just.  The application must be filed within the same thirty-day time period for filing the civil action.

*Christine Muringer*

Christine Muringer
EEO Services Analyst                                   Date: February 6, 2020
NEEOISO
P. O. Box 21979
Tampa, FL 33622-1979

**Enclosure:** MSPB Appeal Form 185

cc:
Complainant
Pedro Simpson
957 South Nielson St.
Gilbert, AZ 85296-3668
**USPS Tracking No.  9114 9014 9645 1931 6284 25**