**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Pedro A. Simpson, | No. CV-20-00495-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Louis DeJoy, Postmaster General, United States Postal Service | |
| Defendant. | |

Pedro A. Simpson ("Simpson") has sued his former employer, the United States Postal Service (the "Agency").[1] Now pending before the Court is the Agency's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim. For the following reasons, the motion is granted in part and denied in part and the Agency is granted leave to file a successive dismissal motion.

**BACKGROUND**

I.    <u>Underlying Facts</u>

The following facts, which are presumed true, are derived from the First Amended Complaint ("FAC") (Doc. 35) and from documents incorporated by reference in the

---

[1] Megan Brennan, the original named defendant in this action, was the Postmaster General at the time the complaint was filed, but she has since stepped down. Louis DeJoy is the current Postmaster General and is therefore automatically substituted as the defendant under Federal Rule of Civil Procedure 25(d). *See also* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 25, at 762 (2021) ("Under Rule 25(d), substitution is automatic when a public officer sued in his or her official capacity leaves office and is replaced. No substitution order or motion is necessary.") (footnote omitted).

complaint or subject to judicial notice.

In 1976, Simpson began his career with the Agency.  (Doc. 35 at 2 ¶ 1.)[2]  In 1992, Simpson became the Arizona District IT Manager.  (*Id.*)  Simpson served in this role until he submitted a petition for retirement on July 1, 2019, shortly after his sixtieth birthday.  (*Id.* at 3 ¶ 4.)

In March 2016, Simpson underwent surgery for cancer.  (*Id.* at 3 ¶ 1.)  At the start of his illness, Simpson only shared news of his condition with his supervisor, District Manager John DiPeri ("DiPeri").  (*Id.*)  By the summer of 2018, Simpson had "been through some 6-7 surgeries." (*Id.*)

In 2018, DiPeri was detailed to a different region.  (*Id.* at 3-4 ¶ 1.)  Gail Hendrix ("Hendrix"), a District Manager from Missouri, replaced him.  (*Id.*)  Hendrix "very quickly began a campaign to eliminate [Simpson] from his job," starting with "task[ing] [him] with meaningless assignments." (*Id.*)

In the summer of 2018, Hendrix "forced [Simpson] into a Reasonable Accommodation Process intended to return him to his office." (*Id.* at 4 ¶ 3.)  During this process, Simpson "met with the District Reasonable Accommodation Committee" ("DRAC"), which consisted of Human Resources Manager Lerene Wiley ("Wiley") and "two employees from her team." (*Id.*)  Simpson "provided detailed information about his . . . disability" and ultimately came to an agreement with DRAC, which the Agency memorialized in a letter on June 27, 2018.  (*Id.*)  In addition to "articulating [Simpson's] and [Wiley's] agreement," the letter "[]unexpectedly[] grant[ed] authority over the 'specific details'" to the District Manager.  (*Id.*)

On July 9, 2018, Simpson returned to work and "worked an office schedule based on the spirit of his agreement" with DRAC.  (*Id.* at 4-5 ¶ 3.)  Upon Simpson's return to work, Richard "Marty" Chavez ("Chavez"), the new District Manager, met with Simpson and informed him that "he was monitoring [Simpson's] office time by [his] badge entry

---

[2]     The paragraph numbers in the FAC restart with each new subheading.

and exit records" and that any work from home would not count.  (*Id.* at 5 ¶ 4, first.)[3]
Chavez suggested that Simpson start reporting to work at 5:00 a.m., which he agreed to
and began doing.  (*Id.*)  "Additionally, based upon the IT needs of the District, [Simpson]
diligently continued to work from home, including afternoons, evenings, weekends, and
holidays." (*Id.*)

At some point, Chavez told Simpson that if "he did not like the requirement [of
being monitored], [Simpson] should appeal it to the Western Area." (*Id.* at 5 ¶ 4, second.)
Simpson did so, but because more than 10 days had elapsed since Simpson entered into the
agreement with DRAC, "the Western Area HR Manager denied [the] appeal." (*Id.*)
Following this appeal, the Agency "made [Simpson's] work environment extremely and
increasingly hostile toward" him. (*Id.* at 5-6 ¶ 5.)  Despite this, Simpson chose not to file
an Equal Employment Opportunity ("EEO") complaint because he was "waiting[] out the
horrific environment in which [the Agency] placed him absent his legitimate District
Manager" and because "[f]iling EEOs against an acting DM when one's DM is returning
is only career suicide." (*Id.* at 6 ¶ 7.)

In June 2019, the Agency held a meeting in Avondale, Arizona. (*Id.* at 6 ¶ 6.) "At
the same time, the District was preparing for a promotional upward mobility event in
Albuquerque," for which the "District promoters selected a non-postal site." (*Id.*) Two
days before the event, Renee Jones-Chaney ("Jones-Chaney"), the Tucson Plant Manager,
"demanded support from District IT," including a list of demands, "which District IT has
never provided nor are capable of providing." (*Id.*) Simpson replied to Jones-Chaney that
"District IT could not deliver her demands" because, "[f]or off-site events, District IT
support is limited to access to the USPS network and interfacing with the contracted site's
IT group to coordinate what *they* must deliver." (*Id.* at 7 ¶ 2.) Jones-Chaney in turn
complained to Chavez, who "instructed [Simpson] to provide everything on [Jones-
Chaney's] list." (*Id.*)

On June 5, 2019, Simpson sent an email to Chavez and informed him that, to comply

---

[3]    Page five of the FAC contains two paragraphs labeled as "4."

with Jones-Chaney's demands, "the District would be required to spend funds, Chavez would have to approve the funds, and neither [Simpson] nor District IT would violate Federal purchasing laws (and Western Area Purchasing Guidelines)."  (*Id.* at 7 ¶ 3; 10 ¶ 1.)

In response to this email, Simpson received a letter on June 6, 2019, placing him "off duty on an emergency basis" without pay, and he was escorted off the premises.  (*Id.* at 8 ¶ 2, 10-12 ¶ 1.)  That same day, Simpson sent an email to Chavez stating that he was "deprived of [his] right to a clear statement and an explicit statement of [his] rights" because he could not access the two Employee and Labor Relations Manual ("ELM") provisions cited as reasons for his placement on emergency off-duty status.  (*Id.* at 10-12 ¶ 1.)  Simpson stated that the email would "serve as [his] Notice of Appeal pursuant to all of [his] legal rights without any waiver" and requested that Chavez "provide [him] with information about how to contact an EEO Specialist."  (*Id.*, emphasis omitted.)  Simpson stated that Chavez's actions were "clearly retaliatory" for working under a reasonable accommodation agreement.  (*Id.*)  Simpson also demanded his right to sick leave under the Family Medical Leave Act ("FMLA") and stated that he would begin taking FMLA sick leave the next day.  (*Id.*)  The Agency "has never placed a manager who reports directly to the District Manager in an emergency off duty status without pay in the history of the Arizona District" as organized in 1992.  (*Id.* at 8 ¶ 4.)

Chavez "and the entire team of senior managers . . . ignored [Simpson's] request demanding . . . appeal rights and . . . request for information about how to file [an EEO] Complaint."  (*Id.* at 8 ¶ 3.)  Nevertheless, on June 13, 2019, Simpson "filed his EEO Complaint via the USPS online EEO system."  (*Id.*)  Ultimately, at some point, Post Office Operations Manager Tina Sweeney ("Sweeney") "rescinded the letter placing [Simpson] in an off duty status without pay."  (*Id.* at 12 ¶ 2.)

Simpson complains that the Agency "never granted [him] his Due Process rights before constructively terminating [his] employment"; "never invited [him] to a Fact Finding"; "never returned [his] USPS identification/security entry badge, his agency smartphone, or his key to his office"; "never advised [him] about how to reach an EEO

counselor or about how to file an Agency EEO complaint"; and "forced [him] to submit a petition for retirement." (*Id.*) Simpson also alleges that he "continues to suffer greatly from the negligent and intentional infliction of emotional [d]istress" caused by the Agency and states that he "has suffered from great emotional distress including . . . anxiety, related body rashes, increased sleep disorder, and a requirement to seek psychiatric consultation and counseling." (*Id.* at 10 ¶ 6.)

II.   <u>Procedural History</u>

A.   **Administrative Proceedings**

On September 25, 2019, Simpson filed a formal discrimination complaint with the Agency's EEO. (Doc. 37-1 at 7-15.)[4]

On October 10, 2019, the Agency's EEO accepted Simpson's complaint for investigation. (Doc. 37-1 at 17.) The acceptance notice seemed to suggest that the EEO was only agreeing to investigate one specific claim—that Simpson had been subjected to a hostile work environment that resulted in his constructive discharge. (*Id.* ["<u>Specific Issue(s)</u>: You alleged you had been subjected to a hostile work environment beginning in June 2018 resulting in your . . . constructive discharge . . . based on Race . . . , Color . . . , National Origin . . . , Age . . . , Retaliation . . . , Physical Disability . . . , Mental Disability . . . , and Genetic Information . . . ."].)

---

[4]   The Agency attaches several exhibits to its motion to dismiss: (1) the Agency's Notice of Emergency Placement in an Off-Duty Status (Doc. 37-1 at 3); (2) the Agency's Rescission of Emergency Placement Status (*id.* at 5); (3) Simpson's administrative complaint (*id.* at 7-15); and (4) the Agency's Acceptance for Investigation (*id.* at 17-19). Simpson does not dispute the authenticity of any of the exhibits. The Court may consider all of these documents when ruling on the Agency's motion because they are subject to judicial notice and/or are referred to in the FAC. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."). *Cf. Lacayo v. Donahoe*, 2015 WL 993448, *9 (N.D. Cal. 2015) ("In the context of employment discrimination cases in particular, it is well established that courts may consider the administrative record of a plaintiff's claims before the EEOC as judicially noticeable matters of public record. . . . The extrinsic evidence that Defendant submitted all pertains to Plaintiff's administrative proceedings with the EEO; thus, all are either referenced in the complaint or matters of public record and properly considered on either a 12(b)(1) or 12(b)(6) motion to dismiss."); *Leon v. Danaher Corp.*, 2011 WL 13190172, *3 (D. Ariz. 2011) ("[T]he Court takes judicial notice of the EEOC proceedings in Plaintiff's case, including the EEOC Charge.").

On February 6, 2020, the Agency's EEO issued a finding of no discrimination. (Doc. 1 at 12-46.)[5]  Notably, although the final decision addressed whether Simpson had been subjected to a hostile work environment resulting in his constructive discharge (*id.* at 37-45), it was not limited to that issue.  Instead, it also addressed whether Simpson had separately asserted valid claims for disability discrimination (*id.* at 26-28), retaliation (*id.* at 28-30), disparate treatment (*id.* at 30-32), and age discrimination (*id.* at 32-36).

### B.   **This Action**

On March 3, 2020, Simpson filed the complaint.  (Doc. 1.)

On June 1, 2020, the Agency filed an answer.  (Doc. 23.)

On August 19, 2020, the Court held the scheduling conference.  (Doc. 30.)  During it, the Agency raised concerns about the clarity of the complaint.  (*Id.*)  In light of those concerns, Simpson requested, and the Court granted, leave to file the FAC.  (*Id.*)

On September 21, 2020, Simpson filed the FAC.  (Doc. 35.)

On October 5, 2020, the Agency filed the motion to dismiss.  (Doc. 37.)  The motion has since become fully briefed and neither side requests oral argument.  (Docs. 39, 40.)

### DISCUSSION

I.   Legal Standards

### A.   **Rule 12(b)(1)**

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a defendant may move to dismiss an action for "lack of subject-matter jurisdiction."  "[I]n reviewing a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, we take the allegations in the plaintiff's complaint as true."  *Wolfe v. Strankeman*, 392 F.3d 358, 362 (9th Cir. 2004).  "[I]n ruling

---

[5]       Simpson attached the final agency decision to his initial complaint (Doc. 1 at 12-46) but only attached the last two pages of the decision to the FAC (Doc. 35-1).  The Court may nevertheless consider the document attached to the now-superseded complaint, whether analyzed under Rule 12(b)(1) or 12(b)(6).  "[I]n ruling on a 12(b)(1) jurisdictional challenge, a court may look beyond the complaint and consider extrinsic evidence."  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003) (alteration in original) (internal quotation marks omitted).  The Court may also consider the decision for purposes on ruling on the Agency's motion to dismiss under Rule 12(b)(6) because the decision is subject to judicial notice and/or because Simpson incorporated the decision by reference by attaching the last two pages to the FAC.

on a 12(b)(1) jurisdictional challenge, a court may look beyond the complaint and consider extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1145 n.5 (9th Cir. 2003). The plaintiff bears the burden of establishing that subject matter jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

B.   **Rule 12(b)(6)**

"[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-680. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679. The court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

C.   **Exhaustion**

A plaintiff must exhaust available administrative remedies before filing a Rehabilitation Act or Title VII claim in federal court. *Kraus v. Presidio Tr. Facilities/Residential Mgmt. Branch*, 572 F.3d 1039, 1043 (9th Cir. 2009) (Title VII); *Cherosky v. Henderson*, 330 F.3d 1243, 1245 (9th Cir. 2003) (Rehabilitation Act). For federal employees, such administrative remedies begin at the EEO of the employing agency, not at the EEOC. *Kraus*, 572 F.3d at 1042-43.

1.   Failure To Contact EEO Counselor

An aggrieved federal employee "must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter" and "must initiate contact with

a Counselor within 45 days of the matter alleged to be discriminatory . . . ."  29 C.F.R. § 1614.105(a).  *See generally Sommatino v. United States*, 255 F.3d 704, 708 (9th Cir. 2001) ("[A] federal employee must notify an EEO counselor of discriminatory conduct within 45 days of the alleged conduct, and then, if the matter is not resolved, the employee may submit a formal administrative complaint.").  Failure to initiate contact with an agency EEO counselor within 45 days is grounds for dismissal, although the time limit may be extended pursuant to waiver, estoppel, or equitable tolling.  *Kraus*, 572 F.3d at 1043. Although the administrative exhaustion pre-filing requirement "does not carry the full weight of statutory authority and is not a jurisdictional prerequisite for suit in federal court," the Ninth Circuit has "consistently held that, absent waiver, estoppel, or equitable tolling, failure to comply with this regulation is fatal to a federal employee's discrimination claim in federal court." *Id.* (cleaned up).  *See also Fort Bend County v. Davis*, 139 S. Ct. 1843, 1851 (2019) ("Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts.").  "The limitations-period analysis is always conducted claim by claim" and "begins running on any separate underlying claim of discrimination when that claim accrues." *Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016).  Untimely allegations may be considered, however, in the adjudication of the timely claims.  *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002).

### 2.   Administrative Scope

"Subject matter jurisdiction extends over all allegations of discrimination that either fell within the scope of the EEOC's *actual* investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination."  *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002) (internal quotation marks omitted).  *See also Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003) ("The jurisdictional scope of the plaintiff's court action depends on the scope of the EEOC charge and investigation.").  "Allegations of discrimination not included in the plaintiff's administrative charge may not be considered by a federal court unless the new claims are like or reasonably related to the

allegations contained in the EEOC charge." *B.K.B.*, 276 F.3d at 1100 (internal quotation marks omitted). Courts in the Ninth Circuit "construe charges filed before the EEOC . . . liberally." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1061 (9th Cir. 2006). Despite this liberal construction, "there is a limit to such judicial tolerance when principles of notice and fair play are involved." *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) (citation and internal quotation marks omitted). "The rule of liberal construction does not suggest that a plaintiff sufficiently exhausts his administrative remedies under Title VII by merely mentioning the word 'discrimination' in his or her EEOC administrative charge." *Id.* at 637. "[T]he inquiry into whether a claim has been sufficiently exhausted must focus on the factual allegations made in the charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Id.* "[T]he crucial element of a charge of discrimination is the factual statement contained therein." *B.K.B.*, 276 F.3d at 1100 (alteration in original) (internal quotation marks omitted). A "plaintiff's civil claims [are] reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case." *Id.*

II.   Uncertainty Over What Claims Were Administratively Exhausted, Are Being Asserted In The FAC, And Are Now Being Challenged By The Agency

The FAC is not a model of clarity as to which claims Simpson is actually asserting in this action. It does not set forth any specific counts or causes of action and contains a jumble of confusingly numbered paragraphs. This lack of clarity has greatly complicated the process of ruling on the Agency's motion to dismiss. Additionally, although Simpson is proceeding *pro se*, it appears he is a licensed attorney. (Doc. 37 at 1 n.1.) He is therefore "not entitled to the liberal standards afforded to non-attorney *pro se* plaintiffs." *Lima v. United States Dep't of Educ.*, 2017 WL 2265888, *9 n.13 (D. Haw. 2017). *See also Spadaro v. County of San Bernardino*, 2019 WL 8064075, *3 (C.D. Cal. 2019) (same).

Things have been further complicated by what appear to be some inconsistencies in the Agency's motion papers. The first inconsistency pertains to whether the FAC contains a standalone claim for hostile work environment. In its motion, the Agency seems to

suggest that the FAC doesn't contain a hostile work environment claim.  Instead, the Agency argues that the FAC sets forth the following nine causes of action: (1) constructive discharge related to Simpson's emergency placement on leave without pay in June 2019; (2) violation of due process related to the emergency placement; (3) failure to accommodate a disability (which, in the Agency's view, Simpson mislabeled as a hostile work environment claim); (4) retaliation for engaging in the reasonable accommodation process; (5) retaliation for engaging in protected activity; (6) disparate treatment; (7) negligent infliction of emotional distress; (8) intentional infliction of emotional distress; and (9) violation of due process rights "related to the events that occurred on the day of his emergency placement."  (Doc. 37 at 1-2.  *See also* Doc. 40 at 1-2 [enumerated list of nine claims].)  Notably, in his response, Simpson doesn't appear to dispute this characterization of his claims.  (Doc. 39.)  Nevertheless,  in its reply, the Agency seems to suggest that the FAC also contains a hostile work environment claim.  (Doc. 40 at 2 ["[T]he only causes of action over which the Court has jurisdiction are the causes of action for hostile work environment (based on the five discrete acts Plaintiff has previously identified) and constructive discharge resulting from the hostile work environment."].)  Further adding to the confusion, in the final paragraph of the reply, the Agency states that it is unclear whether the FAC includes a hostile work environment claim.  (*Id.* at 7 ["Defendant acknowledges that Plaintiff has exhausted claims for hostile work environment and constructive discharge.  However, those are the only claims that Plaintiff has exhausted, and it not clear that Plaintiff has asserted those claims in this action."].)

        Another, related source of apparent inconsistency is whether the Agency is seeking to dismiss all or only some of Simpson's claims.  In the final paragraph of both its motion and reply, the Agency asks the Court to "dismiss Plaintiff's amended complaint."  (Doc. 37 at 11; Doc. 40 at 7.)  This suggests that all of Simpson's claims are being challenged.  However, in the course of developing its arguments as to why Simpson's individual claims should be dismissed for lack of jurisdiction and/or failure to state a claim, the Agency's motion only addresses the validity of Simpson's claims for failure to accommodate a

disability (Doc. 37 at 6); retaliation for engaging in the reasonable accommodation process and for engaging in protected activity (*id.* at 7); disparate treatment (*id.* at 8); intentional and negligent infliction of emotional distress (*id.* at 8-9); and due process (*id.* at 9-11).  By the Court's count, these arguments only cover eight of the nine claims that the Agency elsewhere identifies as appearing in the FAC—there is no distinct challenge to the claim for constructive discharge.  Additionally, the Agency does not specifically argue that Simpson's claim for hostile work environment—which, as discussed above, the Agency has variously argued does exist, doesn't exist, and might exist—would be subject to dismissal at this stage of the case.

Finally, yet another source of confusion pertains to the scope of underlying administrative proceedings.  As discussed above, although the Agency's EEO initially seemed to construe Simpson's administrative complaint as asserting a single claim (*i.e.,* hostile work environment resulting in constructive discharge), it ultimately evaluated the complaint as asserting the following claims: (1) disability discrimination; (2) retaliation; (3) disparate treatment; (4) age discrimination; (5) hostile work environment; and (6) constructive discharge.  Notwithstanding this, some of the Agency's exhaustion arguments, discussed in further detail below, are premised on the notion that Simpson only administratively exhausted his claims for hostile work environment and constructive discharge.  (Doc. 40 at 4-5 ["In his administrative complaint, Plaintiff alleged that he was subjected to a hostile work environment comprised of five specific actions that began in July 2018 and resulted in his constructive discharge in June 2019. . . .  [A]ny claim other than the claims for hostile work environment and constructive discharge that Plaintiff advanced in his administrative complaint have not been administratively exhausted and are therefore not appropriately before this Court, including Plaintiff's claims for failure to accommodate his purported disability, retaliation for engaging in the reasonable accommodation process and for engaging in prior protected activity, and disparate treatment."].)

With this backdrop in mind, the Court turns to the Agency's dismissal arguments.

III.   Failure To Accommodate

The Agency interprets—and Simpson does not dispute—the FAC as asserting a claim under the Rehabilitation Act for failure to accommodate a disability.  (Doc. 35 at 3.)  The Agency argues this claim is time-barred to the extent Simpson "is asserting a cause of action for failure to accommodate his disability in July 2018" because "he did not contact an EEO counselor within 45 days after the reasonable accommodation process concluded."  (Doc. 37 at 6.)  Simpson does not respond to the Agency's untimely-presentation argument, other than arguing that the Agency's conclusion and analysis is "flawed" and "ignores the legal standard" in *Green v. Brennan*, 136 S. Ct. 1769 (2016).  (Doc. 39 at 7, 9.)

The Court agrees that, to the extent Simpson is alleging that the Agency's failure to accommodate constitutes a standalone basis for liability under the Rehabilitation Act, as contrasted with a discrete act that might support a hostile work environment claim, it is time barred.  Although the FAC does not specifically articulate the basis for the failure to accommodate claim, the only alleged facts that might pertain to reasonable accommodation stem from the Agency's accommodation process in June 2018.  The FAC asserts that Simpson was "forced . . . into a Reasonable Accommodation Process" and forced to meet with Agency staff.  (Doc. 35 at 4 ¶ 3.)  Simpson and the Agency "reached an [a]greement" memorialized in a letter dated June 27, 2018.  (*Id.*)  On July 9, 2018, Simpson returned to work and maintained a "schedule based on the spirit of [the] agreement."  (*Id.* at 4-5 ¶ 3.)  Upon his return to work, Simpson grew frustrated that Chavez was monitoring his entry and exit times.  (*Id.* at 5 ¶ 4.)  When he voiced his frustration, Chavez instructed him to "appeal . . . to the Western Area."  (*Id.*)  Simpson did so, and his appeal was denied because it was time barred.  (*Id.*)  Nevertheless, Simpson did not contact an EEO counselor until June 13, 2019.  (Doc. 37 at 2, citing Doc. 35 at 8 ¶ 3; Doc. 37-1 at 18 [acknowledging same in acceptance of investigation].)  It is clear that the reasonable accommodation agreement and process occurred more than 45 days before Simpson contacted the EEO counselor in June 2019.

This is not the end of the inquiry.  The FAC further alleges that, after Simpson

returned to the office and challenged Chavez's monitoring of his comings and goings, he appealed to the Western Area, which denied the appeal as time-barred.  It is unclear from the FAC whether this appeal could qualify as contacting an EEO counselor, but even if it could, Simpson was required to file a complaint within 15 days after receiving a notice from an EEO counselor of the right to file an EEO complaint.  29 C.F.R. § 1614.106(b).  Simpson's EEO complaint—filed September 25, 2019 (Doc. 37-1 at 17)—was not filed within 15 days after his appeal to the Western Area, which occurred sometime in 2018.

Insofar as the failure to accommodate claim is a standalone claim, Simpson's reliance on *Green* has no merit.  In *Green*, the Supreme Court held that the 45-day limitation in 29 C.F.R. § 1614.105(a)(1) begins to run on a constructive discharge claim "only after the employee resigns."  136 S. Ct. at 1774.  But here, the Court is only analyzing whether Simpson has properly asserted a standalone claim for reasonable accommodation (as contrasted with a hostile work environment claim premised, in part, on matters related to the reasonable accommodation process).  Thus, the Court grants the Agency's motion to dismiss as to any standalone claim under the Rehabilitation Act for a failure to accommodate Simpson's disability.  The Court does not grant Simpson leave to amend this portion of the FAC because amendment would be futile.

IV.   Retaliation

The Agency moves to dismiss any claim that Simpson was retaliated against for engaging in the reasonable accommodation process and/or for engaging in other protected activity, arguing that he failed to exhaust such claims and/or that he has failed to state a claim.  (Doc. 37 at 7.)  Simpson again doesn't meaningfully respond to the Agency's arguments, other than quoting *Green* at length.  (Doc. 39 at 7, 9.)

A.   **Exhaustion**

The Agency's exhaustion challenge lacks merit.  As discussed in Part I above, the Agency's final decision construed Simpson's complaint as asserting a retaliation claim premised on the notion that "he engaged in the reasonable accommodation process in June 2018, and also was identified by three employees in EEO complaints filed against him in

August 2018." (Doc. 1 at 28-30.) These are the same allegations raised in the FAC—it alleges that Simpson "had engaged in protected DRAC activity and had defended [the Agency] in EEO charges naming [him] as one discriminating management official." (Doc. 35 at 7 ¶ B, emphasis omitted.) Dismissal is not warranted on this basis.

B. **Failure to State a Claim**

As for Simpson's activity in engaging in the reasonable accommodation process, the Agency argues that "engaging in the reasonable accommodation process is not opposing a prohibited activity." (*Id.*) As for the instances in which Simpson was accused by other Agency employees of being a discriminating management official, the Agency argues this is not protected activity because "[p]articipating in an employee's EEO action as the discriminating official does not satisfy the [protected activity] element" but, "rather, at that point, [Simpson] was identified as the individual who committed the unlawful employment practice." (*Id.*)

"To make out a prima facie case of retaliation, [a plaintiff] must establish that he undertook a protected activity under Title VII, his employer subjected him to an adverse employment action, and there is a causal link between those two events." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003). Title VII's anti-retaliation provision contains two separate clauses: the "opposition clause" and the "participation clause." *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). *See also Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009) ("The Title VII antiretaliation provision has two clauses, making it 'an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' The one is known as the 'opposition clause,' the other as the 'participation clause' . . . .") (alterations in original) (citation omitted) (quoting 42 U.S.C. § 2000e-3(a)).

"[T]he opposition clause, by its terms, protects only those employees who oppose

what they reasonably perceive as discrimination under the Act." *Learned*, 860 F.2d at 932 (emphasis omitted).  "An employee engages in protected activity when [he] opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013).  "The term 'oppose,' being left undefined by the statute, carries its ordinary meaning: [t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand." *Crawford*, 555 U.S. at 276 (alterations in original) (citation and internal quotation marks omitted).  "It is unnecessary that the employment practice actually be unlawful; opposition thereto is protected when it is based on a reasonable belief that the employer has engaged in an unlawful employment practice." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) (emphasis and internal quotation marks omitted).

To the extent Simpson's retaliation claim is based on the "opposition clause," the Court agrees with the Agency that Simpson has failed to allege that he opposed any employment practices that he reasonably believed were unlawful.  As for engaging in the reasonable accommodation process, Simpson merely alleges that he met with DRAC, "provided detailed information about his . . . disability," "reached an Agreement with DRAC," and returned to his office.  (Doc. 35 at 4 ¶ 3.)  Even assuming that the reasonable accommodation process could qualify as an unlawful employment practice, nowhere does Simpson indicate that he resisted or otherwise opposed participating in it.  Although the FAC alleges in somewhat conclusory fashion that Simpson was "forced" to participate in the process (*id.* at 4 ¶ 3), it does not allege that Simpson ever expressed any disagreement with this development.  *Cf. EEOC v. Creative Networks, LLC*, 2010 WL 276742, *5 n.5 (D. Ariz. 2010) ("To find protection under the opposition clause, an employee must have opposed an employment practice made unlawful by the statute. . . .  Here, Allen took no action to oppose any unlawful employment practices of Creative Networks."); *McNorton v. Ga. Dep't of Transp.*, 619 F. Supp. 2d 1360, 1376 (N.D. Ga. 2007) ("Plaintiff does not contend that he complained about Smith's treatment of Taylor, that he asserted any negative opinion, or otherwise, implicitly or explicitly, communicated to Kirkpatrick that

he believed that Smith's conduct was unlawful sexual harassment. . . .   [C]onstruing Plaintiff's conduct at the time Kirkpatrick interviewed him regarding Taylor's allegations as 'opposing' an employment practice, in any sense of the word, would require this Court to ignore the plain meaning of the statute.").

As for the EEO complaints filed against the Agency (in which Simpson was accused of being the discriminating official), the Court again agrees with the Agency that Simpson hasn't alleged that he opposed any practice.  Even assuming the underlying incidents could constitute unlawful employment practices, the FAC alleges that Simpson "defended" the Agency against his own actions (Doc. 35 at 7), which is the opposite of opposition.  *Cf. Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1185 (11th Cir. 1997) ("Merritt obviously can find no refuge under the opposition clause, because he did not oppose in any sense of the word the sexual harassment Moore suffered.  To the contrary, he inflicted some of it."); *Buzzi v. Gomez*, 62 F. Supp. 2d 1344, 1354 (S.D. Fla. 1999) ("Gomez cannot show that he had a subjectively reasonable belief that he was *opposing* an unlawful employment practice.  In fact, as Gomez was the subject of the investigation, he was *defending* his employment decisions against the challenges of his subordinate officers who had accused Gomez of engaging in unlawful employment practices.").

For these reasons, to the extent Simpson's retaliation claim is premised on the opposition clause, the Court grants the Agency's motion to dismiss.

Finally, the Court does not rule on whether Simpson has stated a claim under the "participation clause" of Title VII's retaliation provision because the Agency did not develop any specific dismissal arguments as to that issue.  *Cf. Deravin v. Kerik*, 335 F.3d 195, 203 n.6 (2d Cir. 2003) ("As Deravin's claim of retaliation is best understood as falling under [the] participation clause, it should not be analyzed solely under the narrower opposition clause.").

V.   Disparate Treatment

Simpson asserts that he received worse treatment than "similarly situated senior managers" because the Agency "has never placed a manager who reports directly to the

District Manager in an emergency off duty status without pay in the history of the Arizona District as . . . organized . . . in 1992." (Doc. 35 at 7-8.)  The Agency argues that, to the extent Simpson is alleging a disparate treatment claim, Simpson failed to exhaust this claim at the administrative level.  (Doc. 37 at 8.)  Simpson responds that "the entirety of [his] administrative claim and his Amended Complaint cites various aspects of how [the Agency] treated [him] with unconscionable discrimination."  (Doc. 39 at 8.)

The Agency's exhaustion argument lacks merit.  As noted, the Agency's EEO ultimately construed Simpson's complaint as asserting a disparate treatment claim and proceeded to analyze that claim.  (Doc. 1 at 30-32.)  The Agency concluded that, of the discrete acts alleged, Simpson's claim that he was improperly put on emergency off-duty status without pay "would independently state a timely claim outside of a harassment framework," although it further concluded that Simpson had not identified "any similarly situated employees outside of his protected classes who was treated differently than he was under the same or similar circumstances." (*Id.* at 31.)  Accordingly, a disparate treatment claim based on allegations of being improperly placed on emergency off-duty status was properly exhausted.

Because the Agency does not identify any other basis for dismissal of this claim, the Court declines to dismiss it at this juncture.

VI.    <u>Intentional And Negligent Infliction Of Emotional Distress</u>

Simpson appears to assert causes of action for negligent and intentional infliction of emotional distress.  (Doc. 35 at 9 ["[The Agency] damaged [Simpson] irreparably by treating [him] with an unconscionable disregard for [his] Respect and Dignity, negligently and intentionally inflicting unfathomable and unconscionable emotional distress upon [him]."], emphasis omitted.)  The Agency moves to dismiss any such claims because they are preempted by Title VII or, in the alternative, because Simpson didn't administratively exhaust them under the Federal Tort Claims Act.  (Doc. 37 at 8-9.)

Simpson appears to respond only to the Agency's exhaustion argument, arguing that, in an email to the Agency, he "clearly notified [the Agency] that, 'I intend to exercise

all of my available rights,'" a communication that he argues was "made under extreme duress, constructively meet[ing] the requirement of both Title VII and the FTCA per *Green* [and] *Leong*." (Doc. 39 at 9.) He argues that the email substantially complied with the exhaustion requirement, so he met the requirements of Title VII. (*Id.*) The Agency replies that Simpson's cited authorities do not support his "assertion that sending an email stating his intention to exercise all of his available rights is sufficient to satisfy the FTCA's exhaustion requirements" because neither *Green* nor *Leong* "involved tort claims, and neither case addresses the administrative exhaustion requirements" of the FTCA. (Doc. 40 at 5-6.)

The Agency is correct that Title VII preempts Simpson's tort claims. Title VII of the Civil Rights Act of 1964 is the "exclusive, pre-emptive administrative and judicial scheme [available] for the redress of federal employment discrimination." *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 829 (1976). With that said, the Ninth Circuit has permitted Title VII remedies to be "supplemented by state law tort claims when the alleged violations have gone beyond discrimination in the workplace and involve physical or emotional injuries that are highly personal." *Sommatino*, 255 F.3d at 711. Such "highly personal" injuries have included rape, sexual assault, and stalking. *Id.* at 711-12. *See also Brock v. United States*, 64 F.3d 1421, 1423-24 (9th Cir. 1995); *Arnold v. United States*, 816 F.2d 1306, 1311 (9th Cir. 1987); *Otto v. Heckler*, 781 F.2d 754, 758 (9th Cir. 1986), *as amended*, 802 F.2d 337 (9th Cir. 1986). Nevertheless, many courts have held that claims for negligent or intentional infliction of emotional distress are preempted by Title VII, to the extent the claims arise out of the same allegations as the Title VII claims. *See, e.g.*, *Mathis v. Henderson*, 243 F.3d 446, 450-51 (8th Cir. 2001); *McCowen v. Dep't of Veterans Affs.*, 2021 WL 764137, *2 (S.D. Cal. 2021); *Coulibaly v. Kerry*, 213 F. Supp. 3d 93, 125 (D.D.C. 2016); *Abouelhassan v. United States*, 2009 WL 942386, *4 (N.D. Cal. 2009); *Uche-Uwakwe v. Nicholson*, 2006 WL 8438765, *2-3 (C.D. Cal. 2006); *Johnson v. Blue Cross/Blue Shield of Tex.*, 375 F. Supp. 2d 545, 548-50 (N.D. Tex. 2005); *Roland v. Potter*, 366 F. Supp. 2d 1233, 1235-36 (S.D. Ga. 2005); *Wallace v. Henderson*, 138 F. Supp. 2d

980, 986 (S.D. Ohio 2000).

Simpson appears to base his claims for emotional distress on his allegations of placement on emergency off-duty status and constructive discharge.  (Doc. 35 at 9-10.) These allegations form the basis for Simpson's other Title VII claims, so Title VII preempts any state-law tort claims unless Simpson suffered a "highly personal" injury.  Simpson does not meet this high bar.  Being put on emergency off-duty status without pay and being escorted out of the building "is not of the order of magnitude of the personal violation of rape in *Brock*, the forced sexual assaults in *Arnold* (forced kissing, fondling, and blocking the door), and the following and phone calling at home in *Otto*."  *Sommatino*, 255 F.3d at 712.

VII.   Due Process

Simpson alleges that the Agency "discriminately and constructively terminated [his] 42-year meritorious career without cause or Due Process."  (Doc. 35 at 2 ¶ A.)  He further alleges that the Agency did not provide him with due process before (1) escorting him from the building, (2) placing him on emergency off-duty status, or (3) suspending his "IT Infrastructure rights."  (*Id.* at 2-3 ¶¶ 3-4.)  He also alleges that he was denied due process because the Agency did not proceed through a fact finding before placing him on emergency off-duty status.  (*Id.* at 3 ¶ 4.)  Last, he alleges that he was denied due process because the Agency (1) "never returned [his] USPS identification/security entry badge, his agency smartphone, or his key to his office," (2) "never advised [him] about how to reach an EEO counselor or about how to file an Agency EEO Complaint," and (3) "never advised [him] that he could return to his office."  (*Id.*)

Because Simpson's due process allegations suffer from the same lack of clarity as the rest of the FAC, the Agency moves to dismiss any due process claim in whatever form it may take.  To the extent Simpson "is asserting a claim for a violation of his due process rights under the Fifth Amendment," the Agency moves to dismiss on ground that Simpson "has not named a federal official in his or her individual capacity, and cannot assert a constitutional claim against the United States or an agency therefore, or against a federal

employee in his official capacity." (Doc. 37 at 10.) To the extent Simpson's due process claim "concerns allegedly discriminatory behavior by the USPS employees who delivered the emergency placement to [him], took possession of his access badge, USPS laptop, office keys and USPS mobile phone, and escorted him from USPS property," the Agency argues that "such claims are preempted" by Title VII. (*Id.*) And, to the extent the due process claim is "premised upon some deprivation of his property interest in his position unrelated to discrimination," the Agency argues it is "preempted by the Civil Service Reform Act." (*Id.* at 10-11.)

In response, Simpson cites an executive report prepared by the Merit Systems Protection Board ("MSPB") in 2015, which purportedly "explain[ed] what Due Process in Federal Service means,"[6] and the Final Agency Decision, in which the Agency explained that he had two options to appeal the decision (the MSPB or district court). (Doc. 39 at 13-15.) Simpson disputes that he "has no right to judicial review of [the Agency's] conduct, which denied [him] his Constitutional Due Process rights," again citing *Green*. (*Id.* at 15.) The Agency replies that Simpson's response "does not clarify [what his due process claims are], but seems to argue that because the Final Agency Decision includes information about mixed case appeal rights, his undefined due process claims are not preempted." (Doc. 40 at 6.) The Agency argues that, "assuming that [Simpson's] due

---

[6] The Court does not consider the alleged report because it is not before the Court—the link cited by Simpson does not work, so the Court is unable to evaluate the accuracy of any quoted content, and even if the link did work, the website appears to be private and commercial, so content appearing on it would likely not be subject to judicial notice. *See, e.g.*, *Morgan v. Rohr, Inc.*, 2020 WL 1451583, *3 (E.D. Cal. 2020) ("[A]s Defendants correctly note, Plaintiff's website printouts are not a proper subject of judicial notice because the contents of the website cannot be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.") (internal quotation marks omitted); *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, 2019 WL 1923034, *4 (W.D. Wash. 2019) (collecting cases); *Rollins v. Dignity Health*, 338 F. Supp. 3d 1025, 1032-33 (N.D. Cal. 2018) ("There are at least a trillion web pages on the Internet, and many of the documents within those pages are unsupported, poorly supported, or even false. Of course, that does not make all of those documents inadmissible for all purposes. But they are not inherently reliable, and courts should be cautious before taking judicial notice of documents simply because they were published on a website."); *Harmoni Int'l Spice, Inc. v. Bai*, 2016 WL 6542731, *23 (C.D. Cal. 2016) (denying request for judicial notice of "printouts from non-governmental websites" because "courts do not routinely take judicial notice of document printouts from private, third-party websites").

process claims relate not to his resignation (discharge) itself, but rather to the procedure preceding it, which seems to be the case, they are preempted" by Title VII.  (*Id.*)

To the extent Simpson's due process claim is premised on a violation of the Fifth Amendment and seeks monetary damages (Doc. 35 at 12-14), the Court agrees with the Agency that such a claim may not be maintained against the Postmaster General, in his official capacity, or against the Agency itself.   "In *Bivens*, the Supreme Court recognized . . . an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."  *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1119 (9th Cir. 2009) (internal quotation marks omitted).  But there is "no *Bivens* remedy . . . available against a federal agency."  *Id.* at 1119 (citing *FDIC v. Meyer*, 510 U.S. 471, 484 (1994)).  Nor may a *Bivens* suit be maintained against a federal official in his or her official capacity.  *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007) ("[A] Bivens action can be maintained against a defendant in his or her individual capacity only, and not in his or her official capacity.  This is because a Bivens suit against a defendant in his or her official capacity would merely be another way of pleading an action against the United States, which would be barred by the doctrine of sovereign immunity.") (alteration in original) (citation and internal quotation marks omitted).   Nor does *Bivens* authorize Simpson to pursue his request for what appears to be injunctive relief (requiring the Agency to apologize to him, remove "any document that references a claim that [he] performed any inappropriate action" from his records, provide "remedial training to the management officials" involved and "place a Letter of Warning" in each of their respective files) (Doc. 35 at 13) against a federal official in his official capacity.  *Solida v. McKelvey*, 820 F.3d 1090, 1094 (9th Cir. 2016) ("By definition, *Bivens* suits are individual capacity suits and thus cannot enjoin official government action.").

Simpson provides no clarity as to the basis for his due process claim against a federal official in his official capacity, whether it is asserted under *Bivens*, a federal statute, or otherwise.  "The United States, as a sovereign, is immune from suit unless it has waived

its immunity.  A court lacks subject matter jurisdiction over a claim against the United States if it has not consented to be sued on that claim." *Consejo*, 482 F.3d at 1173 (citations omitted).  "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *Id.* (quoting *United States v. Mottaz*, 476 U.S. 834, 841 (1986)).  "Unless [a plaintiff] satisfies the burden of establishing that its action falls within an unequivocally expressed waiver of sovereign immunity by Congress, it must be dismissed." *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007).  Because Simpson has not identified, much less established, any basis for finding that the United States has consented to be sued on his due process claim(s), the Court dismisses any such claims.  Because it is possible that this deficiency may be cured by amendment, the Court grants Simpson leave to amend as to this particular claim.

VIII.   Conclusion

As discussed in Part II above, the FAC seems to set forth the following 10 claims: (1) constructive discharge related to Simpson's emergency placement on leave without pay in June 2019; (2) violation of due process related to the emergency placement; (3) failure to accommodate a disability; (4) retaliation for engaging in the reasonable accommodation process; (5) retaliation for prior protected activity; (6) disparate treatment; (7) negligent infliction of emotional distress; (8) intentional infliction of emotional distress; (9) violation of due process rights "related to the events that occurred on the day of his emergency placement"; and (10) hostile work environment.  As discussed in Parts III-VII above, all of those claims except No. 1 (constructive discharge), Nos. 4 and 5 (the retaliation claims, but only to the extent they are premised on the "participation clause"), No. 6 (disparate treatment), and No. 10 (hostile work environment) are dismissed.  The dismissal is without leave to amend except as to Nos. 2 and 9 (due process).

The Court further concludes that, under the somewhat unusual circumstances of this case, the Agency should be afforded leave to file another dismissal motion.  The Agency did its very best to make sense of an often inscrutable complaint and it appears to the Court that some of the claims that survived this round of briefing did so only because the Agency

was unaware (for understandable reasons) that they stood apart from the other claims the Agency was challenging.  *Cf. Hasbrouck v. Yavapai County*, 2021 WL 321894, *12 (D. Ariz. 2021) ("Even though a party is ordinarily barred by Rule 12(g)(2) from filing a successive motion to dismiss on grounds that could have been raised in an earlier dismissal motion, the Court will permit the County to file another dismissal motion that addresses Count One.  This outcome is necessitated, in part, by the prolixity of Plaintiffs' complaint, which made it difficult for the County to raise all potential dismissal arguments in the initial motion it filed jointly with the other County Defendants.").

Accordingly,

**IT IS ORDERED** that the Agency's motion to dismiss (Doc. 37) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that the Agency may, within 21 days of this order, file a successive motion to dismiss under Rule 12(b)(1) and/or Rule 12(b)(6) as to the remaining claims in this action.

**IT IS FURTHER ORDERED** that, if the Agency does not file a successive motion to dismiss within 21 days of this Order, Simpson may file, by **July 19, 2021**, a second amended complaint ("SAC").  If Simpson files a SAC, the changes shall be limited to curing the deficiencies related to the due process claims and Simpson shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 14th day of June, 2021.

_____
Dominic W. Lanza
United States District Judge