1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE DISTRICT OF ARIZONA**

8

9    Pedro A. Simpson,                          No. CV-20-00495-PHX-DWL

10                    Plaintiff,                 **ORDER**

11   v.

12   Louis DeJoy, Postmaster General, United
     States Postal Service,
13
14                    Defendant.

15          Pedro A. Simpson ("Simpson") has sued his former employer, the United States

16   Postal Service (the "Agency"), for employment discrimination.  Now pending before the

17   Court is the Agency's motion for summary judgment on Simpson's remaining claims.

18   (Doc. 52.)  For the following reasons, the motion is granted.

19                               **BACKGROUND**

20   I.     Factual Background

21          The background facts below are taken from the parties' summary judgment

22   submissions and other materials in the record and are uncontroverted unless otherwise

23   noted.  Additional facts bearing on the parties' specific summary judgment arguments are

24   addressed in the Discussion portion of this order.

25          In 1976, Simpson began his career with the Agency. (Doc. 52-1 at 72.)  Simpson

26   eventually became the Manager of Information Systems for the Agency's Arizona-New

27   Mexico District.  (*Id.* at 77 ¶ 6.)

28          In March 2016, Simpson underwent surgery for cancer.  (Doc. 53-1 ¶ 1.)  Simpson

1   shared news of his condition with his supervisor, District Manager John DiPeri ("DiPeri").

2   (*Id.*)  At some point before February 10, 2018, Simpson began working remotely.[1]

3       After DiPeri was detailed to a different region, Gail Hendrix ("Hendrix"), a District

4   Manager from Missouri, stepped in as the "Acting District Manager for Arizona-New

5   Mexico" from February 10, 2018 to July 6, 2018.  (Doc. 52-1 at 76 ¶ 3 .)[2]

6       In April 2018, Simpson and Hendrix met telephonically for Simpson's mid-year

7   performance review.  (*Id.* at 77 ¶ 7.)[3]  Following this review, Hendrix asked Lerene Wiley

8   ("Wiley"), the District's Human Resources Manager, to initiate the "reasonable

9   accommodation process" through the "District Reasonable Accommodation Committee"

10  ("DRAC").  (*Id.* at 77-78 ¶ 9.)

11      Simpson met with DRAC on June 27, 2018.  (*Id.* at 5 ¶ 13.)  This meeting resulted

12  in an agreement that Simpson would return to work at the District Office but that his hours

13  would be shifted to avoid peak traffic times.  (*Id.* at 5 ¶¶ 13-16.  *See also id.* at 37 [DRAC

14  Medical Summary Information Sheet, describing Simpson's restrictions as "Driving

15  limited to short distances daily," "Ability to travel to and from a distant office environment

16  is impaired by unpredictable need for immediate access to a restroom," and "Capable of

17  driving intermittently as flare up and frequency of symptoms permit (presently

18  improved)"].)

19      Hendrix and Simpson then spoke by phone and agreed he would return to the office

20  on July 9, 2018.  (*Id.* at 5 ¶ 17.  *See also id.* at 41-42 [Hendrix's notes from July 3, 2018

---

21  [1]     The Agency describes this shift as occurring "at some point prior to April 2018."

22  (Doc. 52 at 2.)  Simpson does not provide an exact date but indicates it was after his cancer
    surgery in March 2016 and before DiPeri's departure.  (Doc. 53-1 ¶ 1.)  Other evidence in

23  the record indicates that DiPeri's departure occurred sometime before February 10, 2018.
    (Doc. 52-1 at 76 ¶ 3.)

24  [2]     In his response, Simpson makes various allegations regarding why Hendrix became

25  Acting District Manager and her work performance, none of which are material to the
    summary judgment analysis.

26  [3]     Although the parties dispute whether Hendrix knew Simpson was working remotely
    before this meeting, they agree Hendrix possessed this knowledge afterward.  (*Compare*

27  Doc. 52 at 2 [stating Hendrix "learned that [Simpson] was not coming into the office at all"
    at the mid-year review meeting in April 2018] *with* Doc. 53 at 3 [including this statement

28  as a disputed fact and alleging Simpson "virtually attended staff meetings wherein Gail
    Hendrix was acting as a DM"].)

call].)  However, Hendrix was replaced by Richard "Marty" Chavez ("Chavez") as Acting District Manager on July 6, 2018, before Simpson's return.  (*Id.* at 95-96 ¶¶ 3, 6.)

On July 9, 2018, Simpson returned to work.  (*Id.* at 6 ¶ 19.)  At this time, Chavez "knew [Simpson] had an altered schedule as a reasonable accommodation but did not know why."  (*Id.* at 96 ¶ 6.)

In September 2018, Chavez and Simpson agreed that Simpson would begin reporting to the office at 5:00 AM and leaving in the early afternoon (according to the Agency, 1:30 PM; according to Simpson, 1:00 PM).  (Doc. 52-1 at 96 ¶ 7; Doc. 53-1 ¶ 3.) Although the exact reason for this arrangement is disputed (as is who suggested the altered schedule), the parties agree that it was based, at least in part, on Simpson's cancer treatments.  (Doc. 52-1 at 96 ¶ 7; Doc. 53-1 ¶ 3.)[4]

In the spring of 2019, Simpson was asked to provide technology support for a Postal Service conference in Albuquerque, which was scheduled for June 6, 2019.  (Doc. 52-1 at 96-97 ¶¶ 11-13.)  On June 4, 2019, Renee Chaney ("Chaney"), one of the event organizers and a Postal Service employee, emailed Simpson asking to check out two flash drives for the event.  (*Id.* at 110.)  In response, Simpson suggested Chaney use "DVD disk[s]" instead of flash drives or use an already-provided flash drive.  (*Id.*)[5]

Later that afternoon, Chaney emailed Simpson a list of requests for various forms of technology assistance for the event.  (*Id.* at 102-04.)  Simpson addressed Chaney's

---

[4]    The Court notes that Simpson's brief describes the new schedule as coming into effect "in the spring of 2019" rather than in September 2018.  (Doc. 53 at 4.)  It is not clear whether this is a mistake, as Simpson does not directly dispute the Agency's assertion that the shift occurred in September 2018.  (*Id.*)  At any rate, to the extent this date is disputed, it is not material to the Court's analysis.

[5]    Simpson alleges that he responded to Chaney's initial email (requesting flash drives) by "immediately advis[ing] her that USPS Security policy precluded the distribution of USPS Flash Drives to unknown or not Exempt employees."  (Doc. 53-1 ¶ 4.)  This response is not reflected in the emails provided as exhibits (Doc. 52-1 at 102-13) and Simpson provides no supporting evidence.  Although Simpson alleges he "has asked repeatedly for access to his email account as of the day when his peers, Lerene Wiley and Tina Sweeney violently evicted Plaintiff from his office as he was working" and that the Agency "declines to provide that essential information"  (Doc. 53-1 ¶ 4), Simpson has not requested additional discovery under Rule 56(f) of the Federal Rules of Civil Procedure, nor has he filed any discovery motions.

requests as follows.  First, in response to Chaney's request for a router "able to work in all of the breakout rooms," Simpson stated: "It is not possible to guarantee this outcome since we have not even known about the venue for more than two weeks.  We literally DO NOT KNOW how well the router will perform at the venue until we install it!"  (*Id.* at 107.) Second, in response to Chaney's request that an "IT person" manage the presentations at the event and Chaney's offer to send the presentations by Friday "so your office can download and prepare," Simpson replied: "Don't bother sending the presentations to my office . . . . I won't be in Albuquerque.  Write the presentations to a DVD as I have repeatedly advised. John Reese . . . will fly to Albuquerque Friday.  Please be advised that John is NOT a presentation specialist. . . .  He will be there to attempt to make all of the USPS Technology work as it should.  You should practice preparing the presentations to run yourself. . . .   Good luck as <u>you</u> coordinate those presentations."  (*Id.*)  Third, in response to Chaney's request for portable microphones, Simpson replied: "It is up to the venue to provide that hardware and ensure that it works . . . ."  (*Id.*)  Fourth, in response to Chaney's request for flash drives or DVD discs, Simpson referred Chaney to "the remainder of my messages" and stated "DVDs have been used routinely since about the early 1990s for media presentation. (Remember Blockbuster?)"  (*Id.*)  Finally, in response to Chaney's closing, which stated "[i]f there is anything more I feel I missed, I will let you know," Simpson responded: "Thank you.  I will respectfully commiserate with YOU for your lack of preparation."  (*Id.* at 107-08.)

Following this exchange, Chaney emailed Chavez separately, reiterating what she needed and asking who else could help her.  (*Id.* at 97 ¶ 15.)  Chavez, in turn, forwarded Chaney's email to Simpson, with a note stating: "I don't want to get stuck on what was and was not said but I need the issues raised below solved prior to Sunday."  (*Id.* at 112-13.) Simpson responded as follows:

> If this is a **direct order** to provide anything and everything that [Chaney] thinks that the "Exec Speakers" want to see, I will ask Bob to submit an emergency request for $10,000 – For whatever yours and [Chaney's] heart desires between now and Sunday.  You must approve that PO or it will not go forward.  You have been holding PO requests for weeks.  We have MTEL printers that we have not been repaired awaiting your approval and much

1
2
3
4
5
6

more.  If your order requires it, I decline to NOT follow the WA Purchasing Guidelines as they might reflect Federal Purchasing Guidelines - aka FEDERAL LAWS.  That is what is necessary to provide what your "team" wants at this late hour.  I am medically incapable of travelling to Albuquerque.  My staff has been all over the two worlds (ABQ and PHX) recently.  They have been working on critical IT issues.  We are not standing around waiting for the next opportunity to impress an "Executive" (Postal Employee).  I do not accept your criticism based on a project that we were just invited to join TWO weeks ago. . . . Make the decision and I and Bob will be up late preparing the PO!  Anecdotally – you base this demand on an, "I was told" statement.  "Who" told that nonsense[]?

7

(*Id.* at 112.)

8
9
10

Chavez viewed these emails from Simpson as "unprofessional," "inappropriate" or "grossly inappropriate," "unhelpful," "unwarranted," and/or "insubordinate."  (*Id.* at 97

11
12
13

¶¶ 13-15.)  Accordingly, after consulting with Wiley and Acting Phoenix Postmaster Tina Sweeney ("Sweeney"),[6] Chavez decided that Simpson "should be issued a Notice of Emergency Placement in an Off-Duty Status pursuant to Section 651 of the Employee and Labor Relations Manual."  (*Id.* at 98 ¶ 18.  *See also id.* at 54-63 [copy of Section 651].)[7]

14
15
16
17
18

On June 6, 2019, Simpson received a "Notice of Emergency Placement" from Sweeney and Wiley.  (*Id.* at 6-7 ¶¶ 22, 25 [Wiley declaration]; *id.* at 44 [actual notice].)  At that time, Simpson was "instructed to turn in accountable items, including his access badge, keys, USPS-issued mobile phone, and USPS-issued laptop, and directed . . . to immediately leave the building."  (*Id.* at 7 ¶ 25.)[8]

19
20
21

A few hours later, Simpson sent the following email to Chavez, Wiley, and Sweeney:[9]

22
23

[6]    Simpson disputes the Agency's description of Sweeney as the "Office[r] in Charge" on June 6, 2019 and asserts that Sweeney was a "District Post Office Operations Manager[]"for "higher level Postmasters." (Doc. 53 at 6.)  To the extent Sweeney's exact position is disputed, this fact is not material to the Court's analysis.

24
25

[7]    Simpson appears to agree with this fact, although he characterizes it differently. (Doc. 53-1 ¶ 6 ["Chavez ordered his HR Manager and acting Phoenix Postmaster, both peers in the District management staff to get rid of Plaintiff without pay."].)

26
27

[8]    The Agency submits undisputed evidence that it took these steps "because of [Simpson's] level of access to the District's Information Systems," which made it "necessary and appropriate to ask [Simpson] to turn these items in." (Doc. 52-1 at 88 ¶10.)

28

[9]    A copy of the email indicates Simpson also cc'ed several others on the email chain, including DiPeri. (Doc. 52-1 at 46-47.)

1

2
This AM at about 0545, POOM Tina Sweeney and HR Manager Lerene
Wiley delivered a letter to my office, while I was already working.  Tina

3
handed me a letter titled "EMERGENCY PLACEMENT IN AN OFF DUTY
STATUS.  The cryptic allegation stated is" Your [sic] sent an inappropriate
message (A) District Manager Marty Chavez, on June 5, 2019.  Tina

4
demanded that I leave the USPS smartphone, laptop, the key to my office,
and my USPS ID.  Then, she demanded that I leave the premises immediately

5
and they escorted me to my vehicle and watched as I exited the compound.
The letter cites all ELM provisions, to which I do not have access.  Thus, I

6
am deprived of my right to a clear statement and an explicit statement of my
rights.  Therefore, this message will serve as my Notice of Appeal pursuant

7
to all of my legal rights without any waiver. . . .  Your actions are clearly
retaliatory.  I have been working an office schedule from 0500-1300 since

8
Marty retaliated against me for the fact that I am working under a Reasonable
Accommodation Agreement.  According to Marty, despite my FLSA

9
EXEMPT Status, "working from home does not count."  Thus, I have, in
good faith, worked a restricted office schedule plus any other work that my

10
position requires from home, including weekends and holidays.  Marty began
his retaliatory campaign to eliminate me immediately after Gail Hendrix left

11
from her detail and Marty began his detail as DM.  I intend to exercise all of
my available rights.  Therefore, please provide me with information about

12
how to contact an EEO Specialist.

13
(*Id.* at 46-47.)  In the same email, Simpson asked to be placed on sick leave under the

14
Family Medical Leave Act ("FMLA") beginning June 7, 2019.  (*Id.*)  In response, the

15
Agency sent a letter to Simpson, dated June 7, 2019, advising him that Sweeney "has been

16
delegated the authority to decision [sic] your appeal and respond to your request for FMLA

17
sick leave. . . .  Attached for your reference is a copy of the provisions of the Employee

18
and Labor Relations Manual . . . ."  (*Id.* at 53.)[10]

19
The following week, Simpson's emergency placement on off-duty status was

20
rescinded.  (*Id.* at 7 ¶ 29 [Wiley declaration]; *id.* at 68 [letter to Simpson announcing

21
recission]; *id.* at 89 ¶ 18 [Sweeney declaration].)

22
On July 3, 2019, Simpson filed for retirement, effective June 30, 2019.  (*Id.* at 7

23
¶ 30.)[11]  At no point did Simpson inform Wiley, Hendrix, Sweeney, or Chavez that he

24

25
[10]    The Agency presents evidence that Simpson's FMLA request was ultimately
granted.  (Doc. 52-1 at 7 ¶ 30.)  Simpson does not dispute this fact.  (*See* Doc. 53 at 7.)

26
[11]    Simpson alleges that, after he submitted his retirement papers, the Agency sent

27
"THREE US Postal Inspectors, federal law enforcement agents, to [his] home" and that
these individuals questioned him until he "advised them that he had filed for his
retirement."  (Doc. 53-1 at 5 ¶ 6.)  Simpson further alleges that "[t]he agents never advised

28
[him] about what crime they were investigating."  (*Id.*)  Simpson characterizes this alleged
incident as "anecdotal but consistent" (Doc. 53 at 7) but does not otherwise explain its

1 believed he was being subjected to a hostile work environment.  (*Id.* at 8 ¶ 32; *id.* at 78
2 ¶ 16; *id.* at 90 ¶ 29; *id.* at 99 ¶ 29.)

3 II.    Procedural History

4        On September 25, 2019, Simpson filed a formal Equal Employment Opportunity
5 ("EEO") complaint.  (Doc. 37-1 at 7-15.)

6        On October 10, 2019, the Agency's EEO office accepted Simpson's complaint for
7 investigation.  (*Id.* at 17-19.)

8        On February 6, 2020, the Agency's EEO office issued a finding of no
9 discrimination.  (Doc. 1 at 12-46.)

10       On March 9, 2020, Simpson filed the complaint.  (Doc. 1.)

11       On August 19, 2020, the Court held the scheduling conference, during which the
12 Agency raised concerns about the clarity of the complaint.  (Doc. 30.)  In light of those
13 concerns, Simpson requested, and the Court granted, leave to file an amended complaint.
14 (*Id.*)

15       On September 21, 2020, Simpson filed his operative pleading, the First Amended
16 Complaint ("FAC").  (Doc. 35.)

17       On October 5, 2020, the Agency filed a motion to dismiss, which later became fully
18 briefed.  (Docs. 37, 39-40.)

19       On June 14, 2021, the Court granted in part and denied in part the Agency's motion
20 to dismiss.  (Doc. 44.)  After noting that "[t]he FAC is not a model of clarity as to which
21 claims Simpson is actually asserting in this action," in part because "[i]t does not set forth
22 any specific counts or causes of action and contains a jumble of confusingly numbered
23 paragraphs," the Court interpreted the FAC as setting forth 10 claims: (1) constructive
24 discharge related to Simpson's emergency placement on leave without pay in June 2019;
25 (2) violation of due process related to the emergency placement; (3) failure to
26 accommodate a disability; (4) retaliation for engaging in the reasonable accommodation
27 process; (5) retaliation for prior protected activity; (6) disparate treatment; (7) negligent

28 ───────────────
relevance to his claims.

infliction of emotional distress; (8) intentional infliction of emotional distress; (9) violation of due process rights "related to the events that occurred on the day of his emergency placement"; and (10) hostile work environment.  (*Id.* at 9, 22.)  The Court dismissed "all of those claims except No. 1 (constructive discharge), Nos. 4 and 5 (the retaliation claims, but only to the extent they are premised on the 'participation clause'), No. 6 (disparate treatment), and No. 10 (hostile work environment)."  (*Id.*)  The Court also concluded that, "under the somewhat unusual circumstances of this case, the Agency should be afforded leave to file another dismissal motion" because the "Agency did its very best to make sense of an often inscrutable complaint and it appear[ed] to the Court that some of the claims that survived . . . did so only because the Agency was unaware (for understandable reasons) that they stood apart from the other claims the Agency was challenging."  (*Id.* at 22-23.)

On July 6, 2021, the Agency filed a motion to dismiss claim Nos. 4 and 5, which are Simpson's retaliation claims premised on the "participation clause" of Title VII. (Doc. 45.)

On August 26, 2021, after Simpson failed to respond to the motion, the Court granted it.  (Doc. 46.)

On May 27, 2022, the Agency moved for summary judgment on Simpson's three remaining claims: No. 1 (constructive discharge), No. 6 (disparate treatment), and No. 10 (hostile work environment).  (Doc. 52.)  The motion is now fully briefed  (Docs. 53, 54) and neither side requested oral argument.

## DISCUSSION

I.  Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotations omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). At the same time, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

…

## II.    The Parties' Arguments

The Agency moves for summary judgment on all of Simpson's remaining claims. (Doc. 52.)  First, as for the disparate treatment claim, the Agency contends that Simpson "cannot establish a prima facie case of discrimination" because he cannot demonstrate that (1) "he was performing to the USPS's legitimate expectations" and/or (2) "similarly situated employees were treated more favorably." (*Id.* at 6-8.)  Alternatively, the Agency contends it is entitled to summary judgment because it "had legitimate, non-discriminatory reasons for issuing [Simpson] the emergency placement" based on the Simpson's "unprofessional emails" to Chaney, refusal to assist Chaney, "insubordinate response" to Chavez, and "apparent efforts to sabotage the Albuquerque event." (*Id.* at 8-9.)  Next, the Agency contends it is entitled to summary judgment on the hostile work environment claim because Simpson provides no evidence that the allegedly harassing actions, "perpetrated by at least three separate individuals, were taken because of his protected status." (*Id.* at 9-12.)  The Agency also contends that the alleged conduct described by Simpson is "not the type of conduct that can create a hostile work environment" because it was "not objectively offensive, hostile, or abusive, [was] not based on [Simpson's] protected status, and [is] not of the required level of severity or seriousness to give rise to a hostile work environment." (*Id.* at 12.)  Finally, the Agency contends it is entitled to summary judgment on the constructive discharge claim because Simpson "cannot establish that he was discriminated against, or that his working conditions had become intolerable as a result of discrimination."  (*Id.*)  The Agency further argues that "[e]ven if the decision to issue Plaintiff a notice of emergency placement was discriminatory, [Simpson] had an opportunity to appeal that decision, and, once it was rescinded, to return to work.  However, rather than trying to resolve the matter, [Simpson] elected to retire." (*Id.* at 12-13.  *See also id.* at 13 ["No reasonable person in [Simpson's] position would have felt compelled to resign because of the emergency placement or the allegedly hostile work environment."].)

Simpson opposes the Agency's motion.  (Doc. 53.)  Simpson broadly characterizes

the Agency's motion as containing "numerous citations to irrelevant cases" and "incorporates by reference [his] arguments and legal precedence from [his] Response to [the Agency's] failed Motion to Dismiss." (*Id.* at 8.)[12] Simpson also purports to identify various disputed facts that are material to his disparate treatment claim. For example, Simpson appears to argue he received worse treatment than similarly situated employees because the Agency "has never placed a manager who reports directly to the District Manager in an emergency off duty status without pay in the history of the Arizona District as . . . organized . . . in 1992." (Doc. 35 at 7-8.)[13] As for whether the Agency had a legitimate, non-discriminatory reason for its actions, Simpson argues that he "has already dispelled this disputed issue repetitively, Supra" and that the Agency's "evolution of the truth is clearly pretextual" and then reiterates his request for a jury trial. (*Id.* at 9.) As for the quality of his work performance, Simpson contends he met the Agency's reasonable expectations for several reasons. First, Simpson explains that he refused to provide the requested IT help on June 5, 2019 because he believed it would violate federal law. (Doc. 53 at 8.)[14] Second, in a related vein, Simpson argues he "offered a solution, which

[12] Simpson's response (Doc. 39) to the Agency's first motion to dismiss (Doc. 37) is attached as an exhibit to his response to the Agency's motion for summary judgment. (Doc. 53-2.) The Court notes that many of Simpson's arguments opposing the Agency's first motion to dismiss do not apply in the summary judgment context. However, to the extent his arguments against dismissal augment or explain his summary judgment arguments, the Court has attempted to incorporate them.

[13] Simpson's most coherent argument regarding "similarly situated" employees appears in the FAC. (Doc. 35 at 7-8.) In his response to the Agency's motion for summary judgment, Simpson appears to take a position contrary to his own interests, stating "no other similarly situated victims exist!" (Doc. 53 at 9.) Simpson then asserts that Hendrix and Chavez acted differently than other district managers had acted toward Simpson in the past. (*See id.* [noting all of the other district managers expected that he would "object, debate, and advise them about a bad choice or an illegal choice" and that "[t]he only district managers who had a real problem with [Simpson's] open and candid advice are the actors – Hendrix and Chavez"].) To the extent this argument applies the "similarly situated" standard to the behavior of the Agency's managerial staff (rather than to how Simpson was treated in relation to other employees who were similarly situated to him), Simpson misconstrues the law.

[14] This is perhaps a generous interpretation of Simpson's response, which states, in response to the Agency's argument that his performance was deficient: "[A]t least since World War II, national and international law has established that defendants cannot claim 'following orders' to negate illegal actions. [Simpson] asks the court to take notice that, federal service protects and indeed requires employees to protect their agency from unlawful orders. In fact, when [the Agency] hired [Simpson] at the age of 17, [the Agency

- 11 -

was that Chavez should approve a Purchase Order to allow District IT to proceed," in response to the requests from Chaney and Chavez on June 5, 2019. (*Id.* at 10-11, emphasis omitted. *See also id.* at 5 ["[Simpson] offered Chavez a professionally practical and legal approach to achieving Chaney's misguided list of requests."].)[15]  Finally, Simpson alleges that Chavez "acknowledged" the fact that Chavez had not received any complaints "of a failure in the IT support that [Simpson] was providing through himself and his staff." (*Id.* at 4.)[16]

Simpson next contends he was subjected to a hostile work environment when Hendrix tasked him with meaningless assignments related to network outages and Chavez "held him to the standard of a not-Exempt employee and monitored his automatic tour of duty rings nor especially [Simpson's] entrance and exit records into the District office." (*Id.* at 10.)  In his FAC, Simpson also alleges that Hendrix "forced" him into a reasonable accommodation process and that Chavez undermined him by routinely challenging Simpson's decisions about potential FLSA violations related to "IT assets." (Doc. 35 at 3-6.)  Simpson also contends the decision to place him on emergency off-duty status without pay despite Simpson's "reasonable" responses to Chaney's "uninformed and unreasonably illegal demands" was discriminatory conduct. (Doc. 53 at 10-11.)

Finally, as for his constructive discharge claim, Simpson contends without explanation that the standard in *Green v. Brennan*, 578 U.S. 547 (2016), governs. (*Id.* at 11.)[17]  Simpson also alleges that "none of the thugs who violated [his] rights to his tenured federal agency job contacted him to offer a way to voluntarily and safely return to work.

required [Simpson] to swear an oath to protect the US Constitution from enemies, foreign or domestic." (Doc. 53 at 8.)

[15]    Simpson offers this statement in response to the Agency's arguments concerning his hostile work environment claim. (*Id.* at 10-11.)  In the spirit of deciding the issues on their merits, and given that Simpson is the nonmoving party, the Court construes Simpson's statements broadly.

[16]    Simpson suggests, albeit in a different context, that the Agency's "reports regarding [his] biannual performance evaluations" show that he "perform[ed] his job functions competently and exemplary." (*Id.* at 2.)

[17]    Simpson's motion opposing the Agency's first motion to dismiss included several pages of quoted language from *Green*. (Doc. 53-2 at 9-13.)

[The Agency] left [Simpson] with two options: camp out at the doorway to a secured facility or . . . retire.  On the date that [Simpson] submitted his retirement papers he confirmed from Bob Garman that his access to the USPS network remained suspended. Constitutional law acknowledges these actions as a constructive termination from a federal job." (*Id.* at 7.)[18]

In reply, the Agency contends Simpson "did not meaningfully respond to the Motion for Summary Judgment, nor did he introduce any specific evidence establishing a genuine issue for trial." (Doc. 54 at 1.)  The Agency argues that, rather than responding to the legal arguments in its motion, Simpson merely "accuses [the Agency] of 'numerous citations to irrelevant cases'" and incorporates "his legal argument produced via [his] Response to [the Agency's] Motion to Dismiss." (*Id.  See also id.* at 2 ["Different standards govern a motion to dismiss and a motion for summary judgment."].)  The Agency further contends that Simpson "has not submitted any significant probative evidence tending to support the complaint," instead "rel[ying] on the allegations in his complaint and his own affidavit," and "does not dispute [the Agency's] facts so much as he seeks to either explain the reasons for his behavior and/or malign defense counsel and the USPS employees involved." (*Id.* at 3.)  The Agency also argues that Simpson's "exclusive reliance on *Green v. Brennan* is entirely misplaced since [the Agency] is not challenging exhaustion or timeliness in the summary judgment motion." (*Id.* at 2.)  The Agency then reiterates many of the arguments contained in its motion for summary judgment.  (*Id.* at 4-11.)

…

_____

[18]     Simpson also suggests, at several points, that the Agency's arguments violate Rule 11.  (*See, e.g.*, Doc. 53 at 10 [as to the hostile work environment claim, arguing that the Agency "plays loosely, perhaps in violation of Rule 11, with the truth about this disputed matter"]; *id.* [as to whether Chavez was monitoring Simpson's badge records, arguing "Rule 11 requires at a minimum, that [the Agency] perform a reasonable inquiry about these lies"]; *id.* at 11 [as to whether a purchase order was required to fulfill Chaney's requests, arguing "Rule 11 requires at a minimum that [the Agency] perform a reasonable inquiry about these lies"].)  To the extent Simpson is requesting sanctions under Rule 11, his arguments are unavailing.  "A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." Fed. R. Civ. P. 11(c)(2).  To the extent Simpson is suggesting the Court should, on its own, find that Rule 11 has been violated, the Court declines to do so.

1    III.    <u>Analysis</u>

2          A.    **Threshold Considerations**

3          Simpson's response to the Agency's summary judgment motion is, like his FAC,

4    not a model of clarity.  It does not set forth any specific counts or causes of action, contains

5    only a handful of legal citations (Rules 11 and 56, the FMLA, and *Green*), and provides

6    very few relevant facts in the course of purporting to dispute the Agency's factual

7    assertions.[19]   Simpson's response is so devoid of legal theories and relevant factual

8    allegations that the Court is unable to understand some of his arguments without reference

9    to his FAC.

10         Simpson's reliance on *Green v. Brennan*, 578 U.S. 547 (2016), to avoid summary

11   judgment is misplaced.  In his response, Simpson broadly states that *Green* "overcomes

12   every one of [the Agency's] decorative but ineffectual arguments . . . ."  (Doc. 53 at 2.)

13   Simpson also "incorporates" his response to the Agency's first motion to dismiss, wherein

14   Simpson quoted *Green* at length.  Although *Green* vacated the lower court's entry of

15   summary judgment on employment discrimination claims, the Supreme Court's decision

16   was based on its holding that the limitations period for a constructive discharge claim

17   begins running only after the employee gives notice of his resignation.  578 U.S. at 563-

18   564.  Here, the statute of limitations for Simpson's claims is not at issue, so *Green* is

19   inapplicable.

20         Simpson also fails to support his opposition with sufficient evidence.  Simpson

21   provides only two exhibits to support his position: a copy of his response to the Agency's

22   first motion to dismiss (Doc. 53-2) and a declaration from himself (Doc. 53-1).  The copy

23   of Simpson's response is not evidence.  *Partovi v. Martinez*, 2008 WL 2705370, *3 (D.

24   Ariz. 2008) (citing *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978),

25

26   _____
     [19]      Although Simpson is proceeding *pro se*, it appears he is an attorney. (Doc. 37 at 1
27   n.1 ["It should be noted that although Mr. Simpson is representing himself in this action,
     he is a practicing attorney, and has been an active member of the State Bar of Arizona since
28   May 1995."].)  He is therefore not entitled to the liberal standards afforded to non-attorney
     *pro se* plaintiffs.  *Kelly v. City of Poway*, 2022 WL 1524737, *3 (S.D. Cal. 2022); *Price v.
     Peerson*, 2014 WL 12579823, *4 (C.D. Cal. 2014), *aff'd*, 643 F. App'x 637 (9th Cir. 2016).

for the proposition that "[l]egal memoranda does not constitute evidence"). This leaves Simpson's declaration. As an initial matter, some of the facts alleged in Simpson's declaration are not based on personal knowledge. (*See, e.g.*, Doc. 53-1 at 2 ["Upon information and belief, USPS headquarters placed Gail Hendrix as an acting DM in Arizona because she had lost control of her home district. Reportedly, carrier(s) died because Hendrix' District failed to properly protect them from the summer heat."].) At summary judgment, although a party "is not required to produce evidence in a form that would be admissible at trial, [he] must show that [he] would be able to present the underlying facts in an admissible manner at trial." *De La Torre v. Merck Enters., Inc.*, 540 F. Supp. 2d 1066, 1075 (D. Ariz. 2008). Because Simpson provides no indication that an admissible form of the hearsay in his declaration is anticipated, the Court may not consider those statements. Additionally, Simpson's declaration is filled with conclusory assertions. But "[w]hen the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993). *See also Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").

B.   **Merits**

1.   Disparate Treatment

As an initial matter, Simpson's response does not identify the federal statute underlying his disparate treatment claim or the basis for his discrimination allegations. Simpson's FAC (Doc. 35) and the EEOC's Final Agency Decision (Doc. 1 at 12-46) indicate Simpson may be alleging discrimination due to race, color, or national origin (in violation of Title VII), age (in violation of the Age Discrimination in Employment Act ("ADEA")), or disability (in violation of the Rehabilitation Act). In its motion for summary judgment, the Agency interprets Count Six as alleging disparate treatment under Title VII. (Doc. 52 at 6-9.) Because Simpson does not directly dispute this interpretation

in his response or connect his membership in any specific protected class to the emergency placement (*i.e.*, the adverse employment action underlying his disparate treatment claim), the Court will assume the same.

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."  42 U.S.C. § 2000e–2(a)(1).  Simpson does not provide direct evidence of discrimination.  (*See generally* Doc. 53.)  Thus, Simpson's disparate treatment claim is subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981) (applying the *McDonnell Douglas* to a Title VII claim alleging discriminatory treatment).

Under *McDonnell Douglas*, a plaintiff alleging disparate treatment must first establish a prima facie case of discrimination.  To do so, the plaintiff must show: (1) that he is a member of a protected class; (2) that he was qualified for his position and performing his job satisfactorily; (3) that he experienced an adverse employment action; and (4) that similarly situated individuals outside his protected class were treated more favorably or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.  *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1156 (9th Cir. 2010).  As a general matter, the Ninth Circuit "require[s] very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record."  *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotations omitted).  *See also Burdine*, 450 U.S. at 253-54 ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.").  "Upon these showings, the burden shifts to the defendant to produce some evidence demonstrating a legitimate, nondiscriminatory reason for the employee's termination."  *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004).  "If the defendant meets this burden of production, any

presumption that the defendant discriminated 'drops from the case,' and the plaintiff must then show that the defendant's alleged reason for termination was merely a pretext for discrimination." *Id.* "A plaintiff "may prove pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (internal quotations omitted).

Here, the Agency does not dispute that Simpson belongs to some unspecified protected class or that the emergency placement on off-duty status was an adverse employment action. (Doc. 52 at 7.) Nevertheless, the Agency contends that Simpson is unable to establish a prima facie case of Title VII discrimination because (1) he was not performing to the Agency's "legitimate expectations" and (2) "[n]o similarly situated individuals were treated more favorably." (*Id.* at 7-8.) As for Simpson's job performance, the Agency contends that Chaney's emails to Simpson on June 5, 2019 requested "basic technology and support" and Simpson's responses were "inappropriate and unprofessional." (*Id.* at 7.) The Agency points to copies of the emails, as well as a declaration from Chavez, to support its contention that Simpson was "sabotaging the event" by refusing to assist Chaney, "even when directly ordered to do so by A-DM Chavez." (*Id.* at 7-8.)

Simpson disputes the Agency's characterization of Chaney's requests and his responses. First, he argues that some of Chaney's requests were either against "USPS Security policy," not tasks that "District IT was capable of delivering," or "misguided" because they would require a "public bidding process" under federal law. (Doc. 53 at 4-5.) Simpson does not reference any materials in the record in support of these contentions. Although the Court doubts that Simpson's allegations in his declaration,[20] unsupported by other evidence, are sufficient to create an issue of material fact as to whether he was performing to the Agency's legitimate expectations, the Court finds it unnecessary to reach

---

[20]     Simpson's affidavit is largely a verbatim copy of arguments contained in his response. (*Compare* Doc. 53-1 *with* Doc. 53.)

a definitive judgment on this point because the Agency is entitled to summary judgment for several other reasons.

First, the Court agrees with the Agency that the record evidence does not show that similarly situated individuals outside Simpson's protected class were treated more favorably (or that other circumstances exist that might give rise to an inference of discrimination). The parties agree Simpson was the first employee on the Executive and Administrative Schedule ("EAS") within the Arizona-New Mexico District to be placed on emergency off-duty status without pay. (*See, e.g.*, Doc. 35 at 8 ¶ 5 [FAC, alleging that Chavez, Sweeney, and Wiley previously "admitted that they had not placed any other 'managers' in an off duty status within the last year"); Doc. 52-1 at 8 ¶ 34 [Wiley declaration: "Prior to June 6, 2019, I have never been involved in placing an employee within the [EAS], which consists of supervisors, managers, Headquarters-reporting personnel, and other managerial personnel, on emergency placement."]; *id.* at 90 ¶ 27 [Sweeney declaration: "To the best of my recollection, prior to June 6, 2019, I had not placed an employee within the [EAS] . . . on emergency placement, within the Arizona-New Mexico District."]; *id.* at 100 ¶ 31 [Chavez declaration: "Prior to June 6, 2019, I had never placed an employee within the Arizona-New Mexico District on emergency placement who was on the [EAS] . . . ."].)

For purposes of establishing a prima facie case of Title VII discrimination, "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). In other words, the proper comparators are not other Postal Service employees within the EAS in *general*, but other EAS employees who engaged in conduct similar to that of Simpson. The Agency contends Simpson cannot establish that such comparators outside his protected class were treated more favorably (Doc. 52 at 8), pointing to the declarations that are quoted above. Simpson does not dispute this assertion[21] and a review of the record does not reveal

---

[21]    In the FAC, Simpson describes these declarations as "disingenuous" because they "ignore the fact that [Simpson] reported to ONE manager within the USPS, DM John DiPeri and acting in John DiPeri's place was only Richard Chavez. Both Tina Sweeney and Lerene Wiley were [Simpson's] peers who also organizationally reported to the same

any comparators who engaged in conduct similar to Simpson and were treated more favorably.  In fact, in his response, Simpson states: "Despite [the Agency's] irrelevant allegations that the legal standard requires other Chavez favorites or victims, no other similarly situated victims exist!"  (Doc. 53 at 9.)  Further, Simpson does not identify any comparators outside his protected class or even specify what his protected class is.  In the entirety of his response, Simpson does not mention the race, color, or national origin of any other individual or Postal Service employee.

Simpson also fails to show other circumstances suggesting that the adverse employment action was the result of race- or national origin-based discrimination—there is simply nothing in the record to demonstrate this, nor are there even sufficient allegations to this effect in his FAC.  (*See generally* Docs. 35, 53.)  The exhibits attached to the Agency's motion indicate that Wiley, Hendrix, and Sweeney do not know Simpson's race or national origin.  (*See* Doc. 52-1 at 3 ¶ 4 [Wiley]; *id.* at 77 ¶ 5 [Hendrix]; *id.* at 86 ¶ 4 [Sweeney].)  Also, the EEOC charge and the declarations from Sweeney and Chavez, considered together, show that two of the three individuals involved in the decision to place Simpson on emergency off-duty status, Sweeney and Chavez, are within the same protected class of race as Simpson.  (Doc. 1 at 12; Doc. 52-1 at 86, 95.)  And Simpson's own description of the situation suggests, at most, personal grudges between himself and Chavez unrelated to race.  (*See, e.g.*, Doc. 53 at 9 ["In fact, in the TWENTY-SEVEN years of service to different District Managers, . . . [Simpson] established a repertoire and means of standard communication [with various other District Managers].  . . . The only district managers who had a real problem with [Simpson's] open and candid advice are the actors – Hendrix and Chavez."].)  Thus, a reasonable jury could not find that Simpson has established a prima facie case of Title VII discrimination, even given the low threshold of evidence required to do so.

---

District Manager.  A group of USPS 'managers' did not supervise [Simpson] as Defendant's report implies."  (Doc. 35 at 8-9 ¶ 5.)  However, Simpson does not express any disagreement with the assertion that no other EAS member in the District engaged in similar conduct.

1    Finally, the Agency has articulated a legitimate, non-discriminatory reason for
2    putting Simpson on emergency placement—namely, that his conduct violated the
3    Employee Labor and Relations manual.  As the Agency notes in its motion, the emails
4    Simpson sent to Chaney were "unprofessional," he "refus[ed] to provide [Chaney] with
5    basic supplies like flash drives and wireless microphones and to help her (or to direct
6    another employee in the IT department to help her) load a PowerPoint presentation onto a
7    flash drive," he provided an insubordinate response to Chavez (upon which he copied even
8    higher-level executives), and "his apparent efforts to sabotage the Albuquerque event
9    warranted issuance of the emergency placement."  (Doc. 52 at 8-9.)  The Agency points to
10   declarations by Sweeney and Chavez, both of whom state that Simpson's statements to
11   Chaney and Chavez on June 5, 2019 were unprofessional, insubordinate, and disruptive to
12   postal operations and therefore emergency placement was necessary under the Employee
13   Labor and Relations manual.  (Doc. 52-1 at 87 ¶¶ 6-8 [Sweeney]; *id.* at 97-98 ¶¶ 13-20
14   [Chavez].)  This showing is sufficient to meet the Agency's burden of production.  *Reeves*
15   *v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (the employer's burden is
16   "one of production, not persuasion").

17   Accordingly, Simpson was required to "produce enough evidence to allow a
18   reasonable factfinder to conclude either: (a) that the alleged reason for [his] discharge was
19   false, or (b) that the true reason for his discharge was a discriminatory one."  *Nidds v.*
20   *Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996).  "Under Ninth Circuit law,
21   circumstantial evidence of pretext must be specific and substantial in order to survive
22   summary judgment."  *Brown v. City of Tucson*, 336 F.3d 1181, 1188 (9th Cir. 2003)
23   (cleaned up).  Simpson utterly failed to do so here.  He does not even *allege* a connection
24   between his race, color, or national origin and the emergency placement.  (*See generally*
25   Doc. 53.)  In response to the Agency's arguments, Simpson contends (1) Chaney's requests
26   were improper and unreasonable (*id.* at 4-5), (2) in response to Chavez's email requesting
27   that he help Chaney, he "offered Chavez a professionally practical and legal approach to
28   achieving Chaney's misguided list of requests" and "respectfully offered to work late into

- 20 -

the night along . . . to prepare a Purchase Order conforming to federal law and the Western Area Guidelines" (*id.* at 5-6), (3) fulfilling Chaney's request would violate the Western Area's Purchasing Guidelines and federal law (*id.*), and (4) he had reason to believe Chavez would not approve any related purchase orders because "[f]or months, Chavez had been negligently holding up mission critical postal operations printer repair (MTEL) Purchase Orders[,] . . . sabotaging the flow of mail between operations and downstream facilities" (*id.* at 6).

Simpson does not provide evidence supporting these allegations.  (*See generally* Docs. 53-1, 53-2.)   However, even if he had, Simpson's arguments are unavailing.  "[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (internal quotations omitted).  Simpson does not argue that the Agency did not honestly believe its proffered reasons—in other words, none of the facts he alleges, if true, show that the Agency's explanation is not credible.  *See Short v. DeJoy*, 2022 WL 3098997, *16 (D. Ariz. 2022) ("[T]o survive summary judgment, it would not be enough for Plaintiff to show that Wiley's and Weber's interpretation of the MOU was somehow wrong . . . .  Instead, Plaintiff would need to go further and show that Defendant's representatives didn't honestly believe the proffered interpretation."); *Buhl v. Abbott Labs.*, 817 F. App'x 408, 410-11 (9th Cir. 2020) ("The record is replete with evidence of Buhl's misconduct and performance issues.  Although Buhl attempts to explain away this evidence, . . . he has not offered any other evidence from which a jury could find that Abbott's dissatisfaction with his conduct and performance—dissatisfaction that was expressed by multiple managers on multiple occasions over multiple months—was feigned.").

The bottom line is that Simpson has not provided any evidence creating a genuine issue of material fact as to whether the Agency made the emergency placement because he is a member of a protected class.  Accordingly, the Agency is entitled to summary judgment on his disparate treatment claim.

1

2.   <u>Hostile Work Environment</u>

2       As with the disparate treatment claim, Simpson does not identify the federal statute

3  underlying his hostile work environment claim.  (*See* Docs. 35, 53.)  In its motion for

4  summary judgment, the Agency analyzes the hostile work environment claim as a Title VII

5  claim.  (Doc. 52 at 10-12.)  Simpson does not object to this characterization in his response.

6  (Doc. 53.)

7       If Count 10 is construed as a Title VII hostile work environment claim, the Agency

8  is entitled to summary judgment because Simpson does not even allege that he was

9  subjected to verbal or physical conduct of a prohibited nature.  "To prevail on a hostile

10  workplace claim premised on either race or sex, a plaintiff must show: (1) that he was

11  subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct

12  was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the

13  conditions of the plaintiff's employment and create an abusive work environment."

14  *Vasquez*, 349 F.3d at 642.  Here, other than quoting a provision of Title VII (Doc. 35 at 1

15  ¶ 1), Simpson's FAC and response do not even mention race—his own or that of other

16  employees.  (*See generally* Docs. 35, 53.)

17       The Court is somewhat wary of interpreting Simpson's hostile work environment

18  claim as falling under Title VII because, unlike his disparate treatment claim (which is

19  based on his emergency placement), Simpson's hostile work environment claim seems

20  based at least in part on actions related to disability.[22]  As noted by the Agency, Simpson

21  appears to premise his hostile work environment claim on five instances of conduct:

22  Hendrix tasking him with "meaningless assignments," Hendrix "forcing" him into the

23  reasonable accommodation process, Chavez monitoring his badge records and refusing to

24  acknowledge his remote work, "unknown persons escalating [Simpson's] FLSA decisions

25  to A-DM Chavez for review," and Chaney's requests for IT assistance (and subsequent,

26  related adverse actions).  (Doc. 52 at 10-11.  *See also* Doc. 35 at 3-6 ¶¶ 1-6.)

27

28

[22]     The Court also notes that the EEO investigation covered Simpson's hostile work environment claim in the context of race, color, age, national origin, disability, genetic information, and retaliation.  (Doc. 1 at 12-46 [copy of Final Agency Decision].)

Simpson seems to allege, if indirectly, that several of these events were related to his requests for disability accommodations. For example, he contends that Hendrix "discriminately attempting to show that [he] was not satisfactorily performing his function" was related his remote work, as was Hendrix forcing him into the DRAC process. (*See* Doc. 35 at 3-4 ¶¶ 1-3.) Simpson makes similar allegations about Chavez's conduct. (*See, e.g.*, *id.* at 5 ¶ 4 ["Chavez summoned [Simpson] to Chavez'[s] office. Chavez admitted that he did 'not even know' what [Simpson's] duties required. [Simpson] candidly asked Chavez whether Chavez had received ANY COMPLAINTS about [Simpson's] performance while supporting the District. Chavez replied that he had not received any complaints. Despite . . . the fact that [Simpson] was exceeding the expectations of a District IT Manager, Chavez noted that he was monitoring [Simpson's] office time by [Simpson's] badge entry and exit records. Chavez stated that, 'working from home does not count.'"]; *id.* at 5-6 ¶¶ 4-5 [alleging that Chavez forced Simpson to work a specific eight-hour office schedule and that, after Simpson appealed this decision to the "Western Area" and was denied, Chavez "made the work environment extremely and increasingly hostile toward [Simpson]."].)

The Ninth Circuit has not recognized a hostile work environment claim based on disability discrimination and has declined to decide whether such a claim exists. *Brown*, 336 F.3d at 1190. *See also Meyer v. DeJoy*, 2022 WL 3334981, *2 (9th Cir. 2022) (whether a hostile work environment claim is cognizable under the Rehabilitation Act is unclear) (internal citations and quotations omitted). Nevertheless, even assuming that such a claim is cognizable under the Rehabilitation Act, and further assuming that Simpson could satisfy the first (qualified individual with a disability) and third (conduct was unwelcome) elements of such a claim,[23] the Agency would still entitled to summary judgment on claim

---

[23]     Because the Agency appears to have construed claim No. 10 as alleging a Title VII hostile work environment claim (and this construction was reasonable given the unfocused nature of Simpson's filings), the Agency did not assert any arguments as to whether Simpson was a qualified individual with a disability or whether the conduct was unwelcome. (Doc. 52 at 10-12.) However, because Simpson's hostile work environment claim fails for several other reasons, it is not necessary to analyze those issues in any detail.

No. 10.[24]   Based on the record evidence, a reasonable jury could not find for Simpson because the described conduct was not "sufficiently severe or pervasive to alter the conditions of the [his] employment and create an abusive work environment." *Vasquez*, 349 F.3d at 642.

"To determine whether conduct was sufficiently severe or pervasive . . . , we look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted).  The working environment must "both subjectively and objectively be perceived as abusive." *Id.*   "Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics." *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995), *as amended* (1995).  Here, when compared to other hostile work environment cases,  the alleged conduct is not severe or pervasive enough to be actionable.  For example, in *Kortan v. California Youth Authority*, 217 F.3d 1104 (9th Cir. 2000), the Ninth Circuit held "no triable issue exist[ed] about whether the [supervisor's] conduct was frequent, severe or abusive enough to interfere unreasonably with Kortan's employment" when a supervisor "used gender derogatory language . . . , including referring to various staff members as a 'castrating bitch,' 'Madonna,' and 'regina,'" and "referred to [the plaintiff] as 'Rapunzel' and 'Medea' and wrote postcards to her at home." *Id.* at 1106-08, 1111.  It follows that the challenged conduct here could not, as a matter of law, amount to a hostile work environment—it was less frequent, less severe, and less humiliating than the conduct at issue in *Kortan*.  *See also Vasquez*, 349 F.3d at 644 (holding that "[t]wo isolated offensive remarks, combined with Vasquez's other complaints about unfair treatment" did not create

---

[24]   The Agency's arguments for summary judgment on Simpson's hostile work environment claim were not race- or sex-specific and apply equally to a hostile work environment claim based on disability.  *See also Armijo v. Costco Wholesale Warehouse, Inc.*, 2022 WL 1267254, *14 (D. Haw. 2022) ("The Ninth Circuit has not ruled on the issue of whether a hostile work environment claim can be brought under the ADA. . . .  To the extent that such a claim exists, its elements are similar to the elements of a Title VII hostile work environment claim.").

a hostile work environment).

The Court also agrees with the Agency that the record contains no evidence that the Agency treated Simpson differently on account of disability (or membership in any other protected class).   (Doc. 52 at 11-12 [describing, in relation to each action, the lack of evidence that the allegedly harassing conduct was "because of" Simpson's protected status].  *See also* Doc. 52-1 at 3-4 ¶ 5 [Wiley, stating that Hendrix asked Wiley to initiate the reasonable accommodation process because Simpson was "working from home" but was "required to work from the District office, and there was no formal accommodation in place permitting him to work full-time from [another] location"]; *id.* at 6 ¶ 18 [Wiley, stating that "[Simpson's] race, age, gender, national origin, and genetic information did not play any role in initiating the DRAC process . . . ."]; *id.* at 89-90 ¶ 24 [Sweeney, stating that Simpson's medical status "played no role in my decision to issue [Simpson] a Notice of Emergency Placement"].)  The Court finds there is no genuine dispute of material fact as to whether the allegedly harassing conduct was "because of" Simpson's cancer diagnosis or any related consideration.

### 3.    Constructive Discharge

For purposes of Title VII, "[a] constructive discharge occurs when a person quits his job under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable." *Lawson v. Washington*, 296 F.3d 799, 805 (9th Cir. 2002) (emphasis omitted).  Put another way, "constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (internal quotations omitted).  Thus, "a plaintiff alleging a constructive discharge must show some aggravating factors, such as a 'continuous pattern of discriminatory treatment." *Sanchez*, 915 F.2d at 431.  However, "an employee need not demonstrate that his employer intended to force him to resign, but merely that his conditions of employment

were objectively intolerable." *Lawson*, 296 F.3d at 805.

Here, Simpson's constructive discharge claim fails as a matter of law for the same reasons as his hostile work environment claim—there is insufficient evidence of discriminatory treatment by the Agency from which a jury could conclude that Simpson's work environment was abusive.  "Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." *Brooks*, 229 F.3d at 930.  Even if Simpson disliked the terms of his employment (*e.g.*, the altered schedule or time spent working outside of business hours), there is no evidence that his working conditions were "intolerable" or "discriminatory."  *See also Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) ("To survive Showboat's motion for summary judgment on this claim, Steiner must show that there are triable issues of fact as to whether a reasonable person in her position would have felt that she was forced to quit because of intolerable and discriminatory working conditions.") (cleaned up); *Atwood v. Consol. Elec. Distribs., Inc.*, 231 F. App'x 767, 769 (9th Cir. 2007) ("The mere fact that Atwood felt that his termination was inevitable is not enough to reach a constructive discharge.").

Accordingly,

**IT IS ORDERED** that the Agency's motion for summary judgment (Doc. 52) is **granted**.  Because there are no remaining claims in this case, the Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 17th day of November, 2022.

Dominic W. Lanza
United States District Judge